# STATE OF CONNECTICUT *v.* RAYMOND YOUNG
## (AC 19661)

Landau, Schaller and Hennessy, Js.

Argued April 3—officially released June 19, 2001

James B. Streeto, deputy assistant public defender, for the appellant (defendant).

Robert M. Spector, deputy assistant state's attorney, with whom, on the brief, were James E. Thomas, state's attorney, and Victor Carlucci, Jr., assistant state's attorney, for the appellee (state).

*Opinion*

LANDAU, J. The defendant, Raymond Young, appeals from the judgment revoking his probation rendered after a trial to the court. On appeal, the defendant claims that the trial court improperly (1) refused to admit certain hearsay statements into evidence, (2) concluded that there was sufficient evidence to convict him of violation of probation, and (3) revoked his probation and sentenced him to serve the time remaining on his term of imprisonment. We affirm the judgment of the trial court.

On January 11, 1995, the defendant was sentenced to seven years imprisonment, suspended after one year, and three years probation following his conviction for violation of narcotics laws. His corresponding probation began on June 3, 1996. On May 15, 1997, members of a state and local police crime and gang task force and the Hartford police department street crimes unit were working together to target street level drug dealing in Hartford. Officer Brian Logan of the Simsbury police department was designated as the undercover officer. He was to operate a motor vehicle along Edgewood

Street, purchase $10 of crack cocaine from a seller and leave the area. Officers Luis Rodriguez and Lance Sigersmith of the Hartford police department acted as the cover officers. They were posted in an unmarked police vehicle at the intersection of Edgewood Street and Albany Avenue, where they were able to monitor Logan's welfare through a wire transmitter and identify the seller after Logan left the area.

At approximately 8:45 p.m., Logan drove along Edgewood Street and saw the defendant standing in front of number 56. Logan had previously bought narcotics at 56 Edgewood Street, which is within 1500 feet of the Vine Street elementary school. The defendant made eye contact with Logan, which is the manner in which street dealers indicate that they have narcotics for sale. Logan stopped and asked the defendant for a "ten rock," which is street parlance for a $10 piece of crack cocaine. The defendant gave Logan a small piece of crack cocaine in exchange for $10. Rodriguez and Sigersmith observed the interaction between the two men, although they could not see the narcotics or money exchange hands.

As soon as the transaction was completed, Logan left the area. Using his wire transmitter, Logan provided Rodriguez and Sigersmith with a description of the defendant, specifically, a very large African-American male in his twenties, approximately six feet, six inches tall and extremely muscular. He also gave an explicit description of the defendant's attire. Rodriguez saw the defendant standing in front of 56 Edgewood Street. Logan then met Officer Neville Brooks of the Hartford police department at a predesignated site, where Brooks field tested Logan's purchase, which tested positive for cocaine.

In the meantime, Rodriguez and Sigersmith drove to 56 Edgewood Street and approached the defendant, who identified himself as Raymond Young and pro-

duced photographic identification to that effect. The officers obtained a warrant for the defendant's arrest. When he learned of the warrant, the defendant surrendered and was charged with multiple narcotics violations. The defendant was subsequently arrested and charged with violation of probation.

At trial, the defendant claimed that the charges were the result of mistaken identity. The defendant contended that the individual involved in the transaction was his brother, Jeffrey Young. Jeffrey Young is approximately six feet, four inches tall and weighed between 230 and 240 pounds at the time of that transaction. Rodriguez and Sigersmith made in-court identifications of the defendant. Rodriguez did not know the defendant on the date of the transaction, but knew Jeffrey Young from previous interactions. He was certain that the individual he stopped was not Jeffrey Young. He also thought that Jeffrey Young and the defendant did not look alike. There was conflicting testimony as to whether the person whom the police stopped on May 15, 1997, had gold teeth and which of the brothers had gold teeth. The gold teeth at issue were removable caps. The defendant does not have his two front teeth and has gold caps. The court found that the defendant had violated the terms of his probation for violating the laws of this state and sentenced him to prison to serve the remaining six year portion of his original prison term. The defendant appealed. Additional facts will be provided as necessary.

I

The defendant first claims that the court improperly sustained the state's objections to certain hearsay statements that the defendant proffered, specifically, a statement signed by Jeffrey Young and testimony from the defendant's aunt, Ella Barber. We agree with the court's evidentiary rulings.

Ordinarily, "[o]ur standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Internal quotation marks omitted.) *State* v. *McClendon*, 45 Conn. App. 658, 671, 697 A.2d 1143 (1997), aff'd, 248 Conn. 572, 730 A.2d 1107 (1999).

With respect to both of his evidentiary claims, the defendant argues, on appeal, that the court's rulings were improper because the rules of evidence do not apply to probation revocation hearings. In general, the rules of evidence do not apply to sentencing proceedings, which include revocation of probation matters.[1] *State* v. *Huey*, 199 Conn. 121, 126, 505 A.2d 1242 (1986); see also C. Tait, Connecticut Evidence (3d Ed. 2001) § 1.11.5, p. 36. The defendant, however, ignores the rule's jurisprudential basis. We begin our analysis with a review of the rule's history, specifically, with *Williams* v. *New York*, 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949), in which the United States Supreme Court considered "the rules of evidence applicable to the manner in which a judge may obtain information to guide him in the imposition of sentence upon an already convicted defendant." Id., 244.

Historically, tribunals passing on the guilt of a defendant have always been restrained by evidentiary limitations. Id., 246. At trial, "the issue is whether a defendant is guilty of having engaged in certain criminal conduct

---

[1] Our recently adopted rules of evidence do not apply to sentencing and probation proceedings. Conn. Code Evid. § 1-1 (d) (3) and (4).

of which [the defendant] has been specifically accused. Rules of evidence have been fashioned for criminal trials which narrowly confine the trial contest to evidence that is strictly relevant to the particular offense charged. These rules rest in part on a necessity to prevent a time-consuming and confusing trial of collateral issues. They were also designed to prevent tribunals concerned solely with the issue of guilt of a particular offense from being influenced to convict for that offense by evidence that the defendant had habitually engaged in other misconduct." Id., 246–47.

Prior to and since the founding of the American colonies, however, courts in England and here "practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist [the judge] in determining the kind and extent of punishment to be imposed within limits fixed by law."[2] Id., 246. Unlike a trial judge, who functions somewhat as a keeper of the evidentiary gate, a sentencing judge is charged with determining the type and extent of punishment within fixed statutory and constitutional limits. Id., 247. "Retribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence." Id., 248. "[M]odern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." Id., 247.

"[R]evocation of [probation] is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to

---

[2] That policy has been codified in the Federal Rules of Criminal Procedure, which permit federal judges to consider reports prepared by probation officers. See Fed. R. Crim. P. 32.

[probation] revocations." *Morrissey* v. *Brewer*, 408 U.S. 471, 480, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). A probation revocation hearing "must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation." Id., 488. A probationer is entitled to be heard and show, if possible, that a violation did not occur. The inquiry is a narrow one and "the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." Id., 489.

The process, however, is not so flexible as to be completely unrestrained; there must be some indication that the information presented to the court is responsible and has some minimal indicia of reliability. *State* v. *Huey*, supra, 199 Conn. 127. "Both the probationer . . . and the State have interests in the *accurate* finding of fact and the informed use of discretion—the probationer . . . to insure that his liberty is not unjustifiably taken away and the State to make certain that it is neither unnecessarily interrupting a successful effort at rehabilitation nor imprudently prejudicing the safety of the community." (Emphasis added.) *Gagnon* v. *Scarpelli*, 411 U.S. 778, 785, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973); see also *Morrissey* v. *Brewer*, supra, 408 U.S. 484. "[T]he state, as well as the probationer, has an interest in a *reliable* determination of whether probation has been violated. *Payne* v. *Robinson*, 207 Conn. 565, 574, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988) (rational basis for admission of evidence otherwise subject to exclusionary rule exists . . .)." (Citations omitted; emphasis in original.) *State* v. *Davis*, 229 Conn. 285, 296–97, 641 A.2d 370 (1994). The statements at issue here, however, do not have the necessary characteristics of reliability, and the court's refusal to admit them into evidence did not prejudice the defendant for the following reasons.

## A

The defendant argues that the court improperly refused to admit into evidence a notarized statement signed by his brother, Jeffrey Young. The following facts pertain to this claim. In support of his mistaken identity defense, the defendant called Jeffrey Young to testify at the revocation hearing. He testified that in 1997 he was stopped by police officers on Edgewood Street at least once a week. He also testified that he was stopped by police officers in May, 1997, but was unable to state a specific date or dates on which he was stopped. Jeffrey Young frequently identified himself to police by the name of one of his four brothers, including the name of the defendant, because there were at least two warrants outstanding for his arrest. He did not remember a specific time or date when he used the defendant's name. When defense counsel asked him whether he had ever made a narcotics sale to an undercover police officer, Jeffrey Young answered that he would have no way of knowing whether the person was a police officer.[3] Defense counsel then asked that a document purported to be a notarized statement signed by Jeffrey Young be marked for identification.[4] When defense counsel asked him whether he had made that statement, Jeffrey Young asserted his right against self-incrimination pursuant to the fifth amendment to the United States constitution.[5]

---

[3] During the course of direct examination, the court interrupted, advised Jeffrey Young of his rights and appointed a special public defender to represent him.

[4] Exhibit B for identification stated: "To whom it may concern I Jeffrey B. Young was stop on Egdwood St and sold a ten dollar rock to an uncover officers and when they grab me I used my Brother Raymond Young name and address and they let me go and a week later they came to the address i gave then looking for my Brother and then he turned his self in."

[5] On direct examination by defense counsel, Jeffrey Young testified, in part, as follows:

"Q. Okay. But there was a specific time that you used [the defendant's] name, correct?

"A. I don't know what all that specific—what you mean when you say specific? I used it. I don't know what days it was, I don't know what times

Defense counsel then moved that the written statement be made a full exhibit pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107

it was. I was outside, the police stopped me, I used his name. I used my other brothers' name, whichever name came to my head at the time I was getting stopped, that's the name I used.

"Q. Okay. Do you recall specifically making a statement that was notarized?

"A. I plead the fifth to that one.

\* \* \*

"Q. Do you recall making that statement?

"A. Not in that sense, no. I'm saying the way this statement is wrote, if I did sell to an undercover officer, how would I have the knowledge that he's undercover? It ain't like I was standing there going, 'Oh, there's an undercover officer, let me sell to him.'

"Q. Hold on for a second, Mr. Young. The question is do you recall signing this statement that's before you?

"A. No. I plead the fifth to that.

"Q. So it's your testimony [that] any question I ask you about that statement, you're going to plead the fifth?

"Q. Yes.

\* \* \*

"[Defense Counsel:] Your Honor, I'd like to make a complete record on this. I think under [*State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986)], this can come [into evidence]. And one of the requirements of *Whelan* is that the declarant is unavailable. And clearly [it has] been defined by case law that unavailable means if in fact a defendant or a witness asserts a privilege, which we have in this case. So therefore he's unavailable for testimony. [It has] been signed . . . [it has] been notarized . . . .

"The Court: You're asking the court to make a ruling [on] a piece of paper that you haven't even laid a foundation as to what is in that paper.

\* \* \*

"Q. On the thirtieth day of June, 1997, is it your testimony you do not recall making a signed statement in the presence of [notary] Dolores Lamar?

"A. No, I plead the fifth to that. Don't ask me questions about that.

"Defense Counsel: As you can see, Your Honor, he's not going to answer any questions about this statement. [It has] been signed, [it has] been notarized, [it has] been signed by this defendant. It's impossible to lay a foundation absent bringing the notary in, which I will do if I have to.

"[The Witness:] You said I signed it. I didn't say I signed it. How are you going to say [it has] been signed by me?

\* \* \*

"Q. Mr. Young, did you even have the occasion to make a statement to Ms. Dolores Lamar, who's a notary?

S. Ct. 597, 93 L. Ed. 2d 598 (1986), because the witness was unavailable. The court denied the motion because defense counsel had not laid a foundation for the statement. In response to questions from defense counsel and the court, Jeffrey Young testified that he did not know who the notary was, that he did not knowingly sell drugs to an undercover police officer and that he had never before seen the piece of paper containing the statement. Subsequently, on redirect examination, defense counsel again tried to have the statement admitted into evidence as a prior inconsistent statement.[6] The court sustained the state's objection.

"An out of court statement is hearsay when it is offered to establish the truth of the matters contained therein. . . . As a general rule, hearsay evidence is not admissible unless it falls under one of several well established exceptions. . . . The purpose behind the hearsay rule is to effectuate the policy of requiring that testimony be given in open court, under oath, and subject to cross-examination." (Internal quotation marks omitted.) *State* v. *McClendon*, supra, 45 Conn. App. 671.

---

"A. I don't know who that is. Never heard of that person. . . .

"The Court: Mr. Young, I'm going to show you, [it has] been marked . . . exhibit B. Do you recognize this piece of paper at all?

"A. No.

\* \* \*

"[The Witness:] I already told him that, too. I mean, I don't want to keep sitting here. I'm not going to sit here and tell you I sold to an undercover officer. If he was, I didn't know he was one. See what I'm saying? I was on the street, on drugs, I was doing whatever I could do to get some K, period. Now, if I sold to an undercover officer, I have no knowledge of it. Ain't nobody came to me and said I sold nothing to nobody. And I'm telling you I used his name a lot of times. Yes, I did, I used all my brothers' names a lot of times. Simple. All that sold to an undercover, ain't no undercover came to me and said I sold him nothing. For white people, lot of white people come to that street and buy stuff."

[6] On appeal, the defendant also argued that the statement should have been admitted under the exception to the hearsay rule for statements against penal interest. We decline to review that argument because it was not raised in the trial court.

A prior inconsistent statement signed by the declarant, who has personal knowledge of the facts stated, testifies at trial and is subject to cross-examination, may be used for substantive purposes. *State* v. *Whelan*, supra, 200 Conn. 753. "The proffering party bears the burden of establishing the relevance of the offered testimony. Unless a proper foundation is established, the evidence is irrelevant." (Internal quotation marks omitted.) *State* v. *McPhee*, 58 Conn. App. 501, 513, 755 A.2d 893, cert. denied, 254 Conn. 920, 759 A.2d 1026 (2000).

Here, the court properly exercised its discretion by excluding the statement because the defendant was unable to lay a foundation for its admissibility. Jeffrey Young testified that he did not sign the statement and, when asked by the court, testified that he did not recognize the piece of paper on which the statement was written. The statement, therefore, lacked the minimal indicia of reliability required in probation revocation proceedings.[7] See *State* v. *White*, 169 Conn. 223, 239–40, 363 A.2d 143 (hearsay testimony admissible at probation revocation if reliable and not unsupported), cert. denied, 423 U.S. 1025, 96 S. Ct. 469, 46 L. Ed. 2d 399 (1975).

Furthermore, the defendant was not prejudiced by the court's refusal to admit the statement into evidence. Jeffrey Young admitted that he sold narcotics, that he had no way of knowing whether he sold narcotics to an undercover officer, that he was stopped by the police approximately once a week in 1997, including during the month of May, and that he identified himself by one of his brothers' names because there were two warrants

---

[7] In a footnote in his principal brief to this court, the defendant notes that a statement acknowledged by a notary public is self-authenticating. General Statutes §§ 1-29, 1-36; see *Webster Bank* v. *Flanagan*, 51 Conn. App. 733, 739, 725 A.2d 975 (1999). The defendant did not raise that claim at trial or include it in his argument on appeal. At trial, defense counsel stated that he would subpoena the notary to testify, but the notary did not testify.

outstanding for his arrest. The written statement at issue does not bolster the defendant's theory of misidentification because it does not contain a date on which Jeffrey Young supposedly sold narcotics to an undercover officer.[8] More importantly, Rodriguez, who knew Jeffrey Young from prior interactions, and Sigersmith testified that Jeffrey Young was not the individual who sold crack cocaine to Logan on May 15, 1997.

## B

The defendant claims that the court also improperly refused to permit hearsay testimony from his aunt, Barber, about whether Jeffrey Young had ever told her that he had used the defendant's identity. The defendant claims that the court's ruling was improper because the rules of evidence do not apply to violation of probation hearings. We decline to review the defendant's claim.

The following facts relate to the defendant's evidentiary claim. Barber is the sister of the defendant's deceased mother. During the defendant's direct examination of Barber, he asked, "Did Jeffrey ever tell you that he used [the defendant's] identity?" The state objected on the ground of hearsay, and the court sustained the objection. Thereafter, the defendant again

---

[8] Jeffrey Young also testified at the probable cause hearing concerning the defendant's revocation of probation. At the probation revocation hearing, the prosecutor cross-examined Jeffrey Young, in part as follows, using his testimony at the probable cause hearing:

"Q. And do you recall being informed by the judge at that time that anything you say would—

"A. Yes, sir.

"Q. You could perjure yourself?

"A. Yes, sir.

"Q. And do you recall also when the court asked you, were you the one the police should have arrested rather than your brother [the defendant] selling drugs, and you said: 'No, no, I'm not going to say that, no'?

"A. Yes.

"Q. And you were under oath at that time?

"A. Yes, I was."

asked Barber, "Did Jeff ever tell you that he used [the defendant's] identity?" The state again objected on the ground of hearsay, and the court again sustained the objection. The defendant made no offer of proof as to what Barber would have stated had she been allowed to answer the question.

"It is the appellant's burden to create an adequate appellate record to support his claim. . . . The defendant has failed to meet this burden. If he wanted to provide this court with an adequate appellate record, he should have presented an offer of proof. An offer of proof, properly presented, serves three purposes. First, it should inform the court of the legal theory under which the offered evidence is admissible. Second, it should inform the trial judge of the specific nature of the offered evidence so the court can judge its admissibility. Third, it thereby creates a record adequate for appellate review." (Internal quotation marks omitted.) *State v. One 1993 Black Kenworth W-900 Truck*, 41 Conn. App. 779, 788, 679 A.2d 13 (1996).

Our review of the record discloses that the defendant made no offer of proof as to what Barber's answer would have been, he failed to provide the court with a basis to admit her testimony, and he failed to lay a foundation for that testimony. Thus, the defendant failed to provide an adequate record for appellate review, and we decline to review his claim. Id., 790.[9]

[9] We note that even if we were to review the defendant's claim, it nevertheless would fail because he was not prejudiced by the court's ruling. Even if Barber had been permitted to testify that Jeffrey Young had told her that he had used the defendant's name, such testimony, at best, would have been cumulative of Jeffrey Young's testimony that he had used the defendant's name when he was stopped by police and that he had sold narcotics. Further, the court permitted the defendant, through Barber, to offer into evidence a letter written by the defendant's mother, which stated that Jeffrey Young had used his brother's name and that the police had stopped him on Edgewood Street.

We, therefore, conclude that the court properly exercised its discretion in sustaining the state's objection to certain hearsay statements and that the defendant was not prejudiced by the court's exercise of its discretion.

## II

The defendant's second claim is that the court improperly concluded that there was sufficient evidence to convict him of violation of probation. We disagree.

The defendant's claim is based on conflicting evidence that he was the individual who sold narcotics to Logan on May 15, 1997. As previously stated, the defendant contended that the undercover officer purchased narcotics from Jeffrey Young. Although both men are African-Americans with similar physiques, at the time in question they were distinguishable by their denture. The defendant had two prominent, front gold teeth and Jeffrey Young did not. None of the police officers involved in the undercover purchase or surveillance noticed any gold teeth. The defendant's gold teeth, however, were removable, and at times he did not wear them. The court based its finding that the defendant violated his probation on Rodriguez's testimony.[10] Rodriguez knew Jeffrey Young prior to May 15, 1997, and testified that the person the officers stopped on that date was not Jeffrey Young.

"To support a finding of probation violation, the evidence must induce a reasonable belief that it is more

---

[10] The court stated: "The court makes a finding that the state has sustained its burden of proof. That it in fact had been proved that the defendant is in violation of his probation by a preponderance of the evidence. I agree fully with [defense counsel] that this is a credibility issue. And Officer Rodriguez testified, based on, I believe, five years experience as a police officer, his preacquaintance with Jeffrey Young, prior to the night of May 15, 1997, and his testimony under oath, and his certainty that he did not in fact stop Jeffrey Young on May 15, 1997."

probable than not that the defendant has violated a condition of his or her probation. *State* v. *Davis*, [supra, 229 Conn. 302]. In making its factual determination, the trial court is entitled to draw reasonable and logical inferences from the evidence. . . . This court may reverse the trial court's initial factual determination that a condition of probation has been violated only if we determine that such a finding was clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling . . . . A fact is more probable than not when it is supported by a fair preponderance of the evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Rollins*, 51 Conn. App. 478, 482, 723 A.2d 817 (1999). "It is the sole province of the trial court to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Martinez*, 55 Conn. App. 622, 628, 739 A.2d 721 (1999).

On the basis of our review of the record, it is clear to us that the court based its finding that the defendant violated the terms of his probation on its determination of the credibility of the witnesses, which is solely within the province of the court. We, therefore, conclude that the court's finding that the defendant violated his probation by violating the laws of this state was not clearly erroneous.

III

The defendant's last claim is that the court improperly sentenced him to the unserved portion of his incarceration. The defendant argues on appeal that his selling

$10 worth of crack cocaine was a minor offense that did not warrant the imposition of the remaining six years of his incarceration and that the evidence against him was weak.[11] We are not persuaded.

The following additional facts pertain to our resolution of the defendant's claim. At the time of sentencing, the defendant had a significant criminal record dating back to the 1980s, including convictions for narcotics and probation violations, failure to appear, assault, burglary and threatening. At the time of the probation revocation hearing, the defendant was on probation for another narcotics conviction, and yet another charge of narcotics violation was pending against him for a sale he allegedly made in 1998.

"[U]nder [General Statutes] § 53a-32, a probation revocation hearing has two distinct components. . . . The trial court must first conduct an adversarial evidentiary hearing to determine whether the defendant has in fact violated a condition of probation. . . . If the trial court determines that the evidence has established a violation of a condition of probation, then it proceeds to the second component of probation revocation, the determination of whether the defendant's probationary status should be revoked. On the basis of its consideration of the whole record, the trial court may continue or revoke the sentence of probation . . . [and] . . . require the defendant to serve the sentence imposed or impose any lesser sentence. . . . In making this second determination, the trial court is vested with broad discretion." (Internal quotation marks omitted.) *State* v. *Rollins*, supra, 51 Conn. App. 481–82.

---

[11] The defendant was acquitted of the narcotics charges with which he was charged in relation to the sale of cocaine on May 15, 1997. See *State* v. *Huey*, supra, 199 Conn. 126. To prevail on a charge of probation violation, the state need only prove the violation by a preponderance of the evidence, not the higher standard of beyond a reasonable doubt that is required in a criminal proceeding. *State* v. *Davis*, 29 Conn. App. 801, 811, 618 A.2d 557 (1993), rev'd on other grounds, 229 Conn. 285, 641 A.2d 370 (1994).

"In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling . . . [and] [r]eversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . In determining whether to revoke probation, the trial court shall consider the beneficial purposes of probation, namely rehabilitation of the offender and the protection of society. . . . The important interests in the probationer's liberty and rehabilitation must be balanced, however, against the need to protect the public." (Citations omitted; internal quotation marks omitted.) *State* v. *Bostwick*, 52 Conn. App. 557, 563–64, 728 A.2d 10, appeal dismissed, 251 Conn. 117, 740 A.2d 381 (1999).

On the facts of this case, we conclude that the court did not abuse its discretion in revoking the defendant's probation and sentencing him to the remaining six years of incarceration on the underlying conviction. The defendant has an ongoing criminal history in excess of ten years in duration. He does not comprehend that his failure to refrain from selling narcotics is behavior that society cannot tolerate. The court acted well within the bounds of its discretion in concluding that the rehabilitative purposes of the defendant's probation were not being met.

The judgment is affirmed.

In this opinion the other judges concurred.