# STATE OF CONNECTICUT *v.* MAURICE M.[1]
## (AC 29557)

Bishop, Robinson and West, Js.

---

[1] In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

1

2

Argued February 3—officially released July 28, 2009

 

*Kirstin B. Coffin*, special public defender, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Nicole I. Christie*, assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Maurice M., appeals from the judgment of the trial court revoking his probation pursuant to General Statutes § 53a-32, following his arrest on a charge of risk of injury to a child in violation of General Statutes § 53-21 (a) (1).[2] On appeal, the defendant claims that § 53-21 (a) (1) is unconstitutionally vague as applied to his conduct and that the court (1) applied the incorrect standard for his alleged violation of § 53-21 (a), (2) based its finding that he violated his probation on insufficient evidence and (3) abused its discretion by revoking his probation. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our review of the defendant's claims. On February 4, 2004, the defendant was convicted of assault in the third degree and sentenced to one year incarceration, execution suspended, and three years probation. The

_____

[2] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony for a violation of subdivision (1) . . . of this subsection . . . ."

standard conditions[3] of the defendant's probation included that he refrain from violating "any criminal law of the United States, this state or any other state or territory." On November 26, 2006, the defendant was arrested and charged with risk of injury to a child and, subsequently, with violation of probation.

The record reveals that the following events led to the defendant's arrest on November 26, 2006. At approximately 11 a.m., Joseph Mortari was driving east on Main Street in East Windsor when he saw a pair of brown children's shoes in the roadway near the center divider line. In an attempt to avoid running over the shoes, Mortari maneuvered his vehicle slightly to the right. As he did, he caught a glimpse of something white near the curb and, turning his full attention to it, realized that it was a small child dressed in a diaper climbing from the street to the curb. He slammed on his brakes, stopping his vehicle about three feet from the child. As this transpired, another vehicle traveling in the opposite direction also stopped. Donna Caldon exited that vehicle, driven by her husband, Peter Caldon, and retrieved both shoes from the street and the child, who was then on the curb. Mortari left his vehicle in the street, and he and Donna Caldon conversed momentarily. Mortari retrieved his vehicle, doubled back and met the Caldons in a parking lot. The three attempted to persuade the child to tell them his name or where he lived. The child would not respond. The three then decided to call the police.

Sergeant Michael Hannaford of the East Windsor police department arrived at the scene. After speaking with Mortari and the Caldons, Hannaford started going from house to house on Main Street in an attempt to

---

[3] Standard conditions of probation are imposed on all probationers. The probationer must sign a form detailing these conditions, indicating that the probationer has read, understood and agreed to abide by them. See JD-AP-110 (Rev. May, 2000).

locate the child's home. Soon after, Hannaford was motioned back to the parking lot by Donna Caldon. Hannaford, after seeing the defendant walking toward Donna Caldon and the child, made his way back to the parking lot. It was ten to fifteen minutes after Hannaford arrived at the scene that the defendant emerged from his home and retrieved the child. After speaking briefly with the defendant, Hannaford directed him to take the child home, so the officer could interview Mortari and the Caldons. After conducting the interview, Hannaford went to the defendant's home. There, he questioned the defendant concerning how the child could have gotten from the home to the street.

The defendant reported that the child was two years old. The defendant told Hannaford that he was the sole caretaker present in the home for the child and the child's eight year old brother. The defendant told him that the child was playing with his eight year old brother in the house while the defendant was in the living room lying on the couch watching television. The living room was adjacent to the kitchen, where the back door was located, from which, the defendant concluded, the child had apparently exited the house. Hannaford observed that there were no child safety devices on the door-knobs on the back door. The defendant told Hannaford that at some point, the older child informed him that the two year old was missing. The defendant reported to Hannaford that he then searched the house for the missing child and eventually made his way outside where he and the child were reunited. During Hanna-ford's interview with the defendant, the children's grandparents arrived at the home. Soon after, Hanna-ford arrested the defendant on a charge of having vio-lated § 53-21.

On October 19, 2007, the court, *T. Sullivan, J.*, held a violation of probation hearing. Following the hearing, the court rendered judgment, finding that the defendant

had violated his probation. The court further noted that the defendant was aware of the conditions of his probation, having acknowledged them in writing and reviewed them on three separate occasions with his probation officer. The court further found that the beneficial aspects of probation were no longer being served in the defendant's case. Accordingly, the court revoked the defendant's probation and committed him to the custody of the commissioner of correction for the unexecuted portion of his original one year sentence. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that § 53-21 (a) (1) is unconstitutionally vague as applied to his conduct. We do not agree.

We begin by setting forth the relevant legal principles. "The void for vagueness doctrine is a procedural due process concept that originally was derived from the guarantees of due process contained in the fifth and fourteenth amendments to the United States constitution. The Connecticut constitution also requires that statutes with penal consequences provide sufficient notice to citizens to apprise them of what conduct is prohibited. . . . The constitutional injunction that is commonly referred to as the void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . For statutes that do not implicate the especially sensitive concerns embodied

in the first amendment, we determine the constitutionality of a statute under attack for vagueness by considering its applicability to the particular facts at issue." (Citations omitted; internal quotation marks omitted.) *State* v. *Stuart*, 113 Conn. App. 541, 560–61, 967 A.2d 532 (2009).

"In challenging the constitutionality of a statute, the defendant bears a heavy burden. To prevail on his vagueness claim, [t]he defendant must demonstrate beyond a reasonable doubt that the statute, as applied to him, deprived him of adequate notice of what conduct the statute proscribed or that he fell victim to arbitrary and discriminatory enforcement. . . . The proper test for determining [whether] a statute is vague as applied is whether a reasonable person would have anticipated that the statute would apply to his or her particular conduct. . . . The test is objectively applied to the actor's conduct and judged by a reasonable person's reading of the statute . . . ." (Citation omitted; internal quotation marks omitted.) Id., 562.

If the language of a statute fails to provide definite notice of prohibited conduct, "fair warning can be provided by prior judicial opinions involving the statute"; *State* v. *George*, 37 Conn. App. 388, 390, 656 A.2d 232 (1995); or "by an examination of whether a person of ordinary intelligence would reasonably know what acts are permitted or prohibited by the use of his common sense and ordinary understanding." (Internal quotation marks omitted.) *State* v. *Edelman*, 64 Conn. App. 480, 485, 780 A.2d 980 (2001), appeal dismissed, 262 Conn. 392, 815 A.2d 104 (2003).

Section 53-21 (a) provides in relevant part that "[a]ny person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered . . . shall be guilty of a class C felony

. . . ." "[T]he general purpose of § 53-21 is to protect the physical and psychological well-being of children from the potentially harmful conduct of adults. . . . Our case law has interpreted § 53-21 [(a) (1)] as comprising two distinct parts and criminalizing two general types of behavior likely to injure physically or to impair the morals of a minor under sixteen years of age: (1) *deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare* . . . and (2) acts directly perpetrated on the person of the minor and injurious to his moral or physical well-being. . . . Thus, the first part of § 53-21 [(a) (1)] prohibits the creation of situations detrimental to a child's welfare, while the second part proscribes injurious acts directly perpetrated on the child." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Scruggs*, 279 Conn. 698, 713, 905 A.2d 24 (2006). Guided by the these well established legal principles, our determinative inquiry on the issue of vagueness is whether a person of ordinary intelligence would comprehend that the defendant's conduct was violative of the situation prong of § 53-21 (a) (1).

In the present case, the record reveals that during the events in question, the defendant was solely responsible for the care of his minor sons and that during this time, the defendant was watching television on the couch in the living room while his sons played in a different part of the house. The defendant was aware that the back door of his home was not secured so as to prevent egress by a toddler. The defendant left the children unsupervised long enough for the two year old child to exit the home without the defendant's knowledge and to walk at least 100 feet away from the home into a busy street where he was nearly struck by a vehicle. The defendant was only made aware that the two year old child was missing when the eight year old child notified the defendant that he could not find his younger

brother. The child was outside for twenty minutes before the defendant came to retrieve him.

The defendant, relying heavily on *State* v. *Scruggs*, supra, 279 Conn. 698, argues that he did not have notice that his conduct fell within the scope of § 53-21 (a) (1). In *Scruggs*, our Supreme Court reversed the defendant's conviction of risk of injury to a child for keeping a cluttered and unclean residence, which was alleged to have wilfully caused her son to commit suicide. The *Scruggs* court found that the trial court should have applied an objective standard in determining whether the defendant had notice that her conduct fell within the scope of § 53-21 (a) (1) because, although the defendant reasonably could have been aware of the poor condition of her home, she reasonably could have believed that her conduct was within an acceptable range of risk. The Supreme Court reasoned that "the intent requirement of § 53-21 (a) (1), which, on its face, requires the state to prove only that the defendant had the general intent to commit an act that was likely to injure the health of a child, would be unconstitutionally vague as applied to *otherwise lawful conduct that no reasonable person could have known to have posed such a threat.*" (Emphasis added.) Id., 712. The court concluded that the defendant could not have known that the condition of her home, which was otherwise lawfully maintained, was so squalid that it posed a risk of injury to the mental health of a child within the meaning of § 53-21 (a) (1).

The defendant contends that the present case is akin to *Scruggs* because his conduct, like that of the *Scruggs* defendant, was otherwise lawful. He further asserts that under *Scruggs*, when the defendant's behavior is otherwise lawful, the state must show that the defendant either intended the resulting injury to the victim, knew the injury would occur or acted in reckless disregard of the consequences.

We find that the present case is easily distinguishable from *Scruggs* because here, the causal connection between the defendant's conduct and the risk of physical injury to a child is not tenuous. It was foreseeable that when the door was left unlocked and lacked childproof locks, the unsupervised child might open the door, leave the house and wander into the nearby street. Moreover, we find that the defendant confuses the standard enunciated in *Scruggs*. The *Scruggs* court made it clear that § 53-21 (a) (1) may be unconstitutionally vague as applied to otherwise lawful conduct that a reasonable person would not recognize as posing a risk of injury to a child. Thus, under *Scruggs*, lawful behavior that presents a foreseeable risk of injury to a child still falls under the purview of § 53-21 (a) (1). Here, although the conduct at issue was otherwise lawful, a reasonable person would recognize that allowing a two year old child to play unsupervised in a home situated near a busy street, with an unlocked back door and no child safety devices, presents a foreseeable risk of injury to that child.

Additionally, we find that the defendant had judicial notice that his conduct did not escape the reach of § 53-21 (a) (1). Our case law has interpreted § 53-21 (a) (1) as criminalizing conduct that amounts to deliberate indifference to, the acquiescence in or the creation of situations inimical to a young child's physical welfare. See id., 713. Our Supreme Court has recognized that "§ 53-21 (a) (1) is broadly drafted and was intended to apply to any conduct, illegal or not, that foreseeably could result in injury to the health of a child." Id., 724–25. Moreover, we have noted that "[p]rior cases have held that a defendant who knowingly fails to provide for the protection of a child when that child is under the care of the defendant creates a situation that endangers the physical well-being of the child and, thus, falls with the ambit of the statute." *State* v. *Branham*, 56

Conn. App. 395, 402, 743 A.2d 635 (leaving three young children unattended at home violated § 53-21 [a] [1]), cert. denied, 252 Conn. 937, 747 A.2d 3 (2000); see also *State* v. *Padua*, 273 Conn. 138, 159, 869 A.2d 192 (2005) (defendants wilfully created situation detrimental to welfare of children in violation of General Statutes [Rev. to 1999] § 53-21 [1] when young children had access to marijuana); *State* v. *George*, supra, 37 Conn. App. 390–92 (leaving seventeen month old child unattended in apartment created situation risking injury to child's life or limb). These cases provide notice that a defendant's failure to protect a child from harm creates a situation that is violative of § 53-21 (a) (1). This duty to protect logically includes a duty to supervise one's child, especially where there are known dangers that pose a risk of injury to that child. The defendant knew that his back door was not secure and failed to supervise his children adequately, despite the likelihood that they would be able to open the door and to gain access to a nearby busy street. His inattention, despite known risks, placed his conduct within the scope of § 53-21 (a) (1).

Additionally, adequate warning that one's conduct falls within the scope of a statute "can be provided by an examination of whether a person of ordinary intelligence would reasonably know what acts are permitted or prohibited by the use of his common sense and ordinary understanding." (Internal quotation marks omitted.) *State* v. *Edelman*, supra, 64 Conn. App. 485. "Common sense and experience inform us that young children are inquisitive and impulsive." *State* v. *Padua*, supra, 273 Conn. 159. Thus, common sense would put a reasonable person on notice that allowing a young child to play unsupervised in a house with an unsecured back door permitted a dangerous situation to arise that posed a risk of injury to that child. We conclude, therefore, that § 53-21 (a) (1) is not unconstitutionally vague as applied to the defendant's conduct.

## II

The defendant next claims that the court improperly applied a general intent or negligence standard to § 53-21. Additionally, the defendant argues that because his conduct was not otherwise unlawful, the court had to find that to violate the statute, he knew the injury would occur, he intended the injury or he demonstrated a reckless disregard of the consequences.

Whether the court applied the proper standard to § 53-21 presents a question of law that warrants plenary review. When our review is plenary, "we must determine whether [the court's legal conclusions] are legally and logically correct and whether they find support in the facts set out in the court's [ruling] . . . ." (Internal quotation marks omitted.) *State* v. *Kimble*, 106 Conn. App. 572, 579, 942 A.2d 527, cert. denied, 287 Conn. 912, 950 A.2d 1289 (2008).

The following additional facts assist our review of the defendant's claim. At the probation revocation hearing, the court found that the defendant should have been aware that the circumstances at his home presented a dangerous situation. The court stated: "This was a problem that he knew or should have known existed. It was his house. He lived in the house. He knew that there was no lock on the door. He knew that there was no fence around it, as evidenced by the fact that there is now a fence around the back door. And he knew or should have known that a child could easily get out under those circumstances." The court further stated that the defendant's child "had to go right across that road under circumstances that should never have been allowed to exist. And that was a dangerous situation."

The defendant notes that the court appeared to have applied a general intent or negligence standard to § 53-21 (a) (1), when it stated that the defendant "knew or should have known" that the back door of his house

did not have a lock or child safety device, and thus unlawfully permitted the child to be put in a dangerous situation. The defendant contends that the phrase "knew or should have known" reflects a negligence standard and the language stating that a dangerous situation existed imported the notion of general or strict liability to the statute in question. The state responds, in turn, that the court properly found, in accordance with § 53-21, that the applicable provisions of § 53-21 were violated by evidence that the defendant had the general intent to turn his attention to something other than the child for an extended period of time, thereby breaching his duty to supervise the child, and that he did so with a reckless disregard for the consequences. We agree with the state.

As our Supreme Court has observed, risk of injury to a child is a general intent crime. See, e.g., *State* v. *McClary*, 207 Conn. 233, 240, 541 A.2d 96 (1988); *State* v. *Reid*, 85 Conn. App. 802, 809–10, 858 A.2d 892, cert. denied, 272 Conn. 908, 863 A.2d 702 (2004). "[I]t is not necessary, to support a conviction under § 53-21, that the [accused] be aware that his conduct is likely to impact a child younger than the age of sixteen years. Specific intent is not a necessary requirement of the statute. Rather, the intent to do some act coupled with a reckless disregard of the consequences . . . of that act is sufficient to [establish] a violation of the statute." (Internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 173, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006).

In the present case, the court found that the defendant was watching television instead of fulfilling his duty to watch his young children. The court concluded that the defendant's failure to supervise his young children adequately, despite his knowledge that his back door was not secure, thereby making the busy street

that he lived near easily accessible, amounted to a reckless disregard for the consequences. We find that the record supports the court's conclusions. The record reveals that the defendant was the sole caretaker of the young child. He knew that the back door was not secure and that his home was in close proximity to a busy street. Furthermore, the defendant's inattention was so great that the young child was able to leave the house unnoticed. The defendant's inattention created a situation inimical to the child's physical welfare. See *State* v. *Branham,* supra, 56 Conn. App. 401. We conclude, therefore, that the court's finding that the defendant breached his duty to supervise his young children in violation of § 53-21 (a) (1) was supported by the facts found and was correct in law.

### III

The defendant next claims that the court based its finding that he violated his probation on insufficient evidence. Specifically, the defendant argues that the state failed to prove by a preponderance of the evidence that his conduct amounted to a reckless disregard of the consequences. We disagree.

As a preliminary matter, we set forth the legal principles and the standard of review pertinent to our discussion. "[A] probation revocation hearing has two distinct components. . . . The trial court must first conduct an adversarial evidentiary hearing to determine whether the defendant has in fact violated a condition of probation. . . . If the trial court determines that the evidence has established a violation of a condition of probation, then it proceeds to the second component of probation revocation, the determination of whether the defendant's probationary status should be revoked. . . . Since there are two distinct components of the revocation hearing, our standard of review differs depending

on which part of the hearing we are reviewing." (Citation omitted; internal quotation marks omitted.) *State* v. *Bouteiller*, 112 Conn. App. 40, 51, 961 A.2d 995 (2009).

The defendant's claim that the court did not have sufficient evidence to support its finding that he committed the offense of risk of injury to a child pertains to the first component of the revocation hearing. "In a probation revocation proceeding, the state bears the burden of proving by a fair preponderance of the evidence that the defendant violated the terms of his probation. . . . As a reviewing court, we may reverse the trial court's initial factual determination that a condition of probation has been violated only if we determine that such a finding was clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling . . . ." (Citation omitted; internal quotation marks omitted.) Id., 51–52.

"In order to establish the crime of risk of injury to a child under the situation prong of § 53-21 (a) (1), the state must prove that the defendant *wilfully* or *unlawfully* caused or permitted a child under the age of sixteen years to be placed in a situation where the life or limb of the child was endangered, the health of the child was likely to be injured, or the morals of the child were likely to be impaired. Conduct is wilful when done purposefully and with knowledge of [its] likely consequences. . . . A defendant's failure to act when under a duty to do so, which causes a dangerous situation to exist or continue, may be sufficient to support a conviction under § 53-21 (a) (1)." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Na'im B.*, 288 Conn. 290, 297, 952 A.2d 755

(2008). With the foregoing legal principles in mind, we turn to the defendant's claim.

In support of his claim that his conduct was not reckless, the defendant maintains that, while inside his house, he lost sight of his two year old child for a few minutes while the child was playing in the house with his eight year old sibling. According to the defendant, he immediately began searching for the child once he knew that the child was missing.

Contrary to the defendant's characterization of the facts, the court found that "[o]n the day and time in question, [the defendant] was in his house with the child, who was playing with another slightly older child. [The defendant] knew or should have known that neither the back door nor the back screen door of his house had a lock[4] or a child safety device, thus permitting the child to be able to exit the house. [The defendant] was lying on a couch, watching television in the house while his child was playing. He was not supervising the child, nor was he even aware of the location of the child, who, without the defendant's knowledge, had exited the house through the unsecured back door. The child left the property by himself and was nearly struck by a vehicle as he crossed a busy highway.

"The defendant was the only adult in the house at the time of the incident, and, as the child's father, he was solely responsible for the care and safety of his child. He was under a duty to protect the child but

---

[4] It is unclear from the record whether the defendant's back door had locks or a screen door. Hannaford, the sole witness to testify about the condition of the back door, stated that there were no safety devices on the doorknobs to prevent a young child from opening the door. Regardless of whether the door actually had a lock, it is clear from the record that the door was not sufficiently secured to prevent a toddler from gaining passage through it. Additionally, the court's other findings regarding the defendant's failure to supervise his child and the child's unimpeded access to the street are sufficient to support a finding that the defendant violated § 53-21 (a) (1).

failed to do so, thus unlawfully permitting the child to be put in such a situation that the life or limb of the child was endangered in violation of [§ 53-21] . . . ."

The state offered evidence that the defendant's two year old child was left unattended long enough so that he was able to exit his home unnoticed through an unsecured back door and walk more than 100 feet away to a busy street, where he was almost hit by a truck, and later questioned by concerned drivers who found him alone, in only a diaper, by the side of the street. The court concluded that the testimony of the witnesses established that the defendant had violated the terms and conditions of his probation by permitting a situation that posed a risk of injury to a child. Having carefully reviewed the record, we conclude that that court's conclusion was not clearly erroneous.

Under Connecticut law, parents have a common-law duty to protect their children. See *State* v. *Miranda*, 274 Conn. 727, 779, 878 A.2d 1118 (2005). A defendant's failure to act when under a duty to do so, thereby permitting a dangerous situation to exist or continue, or a defendant's deliberate indifference to a dangerous situation that poses a risk of injury to a child, may be sufficient to support a conviction under the situation prong of § 53-21 (a) (1). See *State* v. *Na'im B.*, supra, 288 Conn. 297; see also *State* v. *Scruggs*, supra, 279 Conn. 713. Thus, the defendant was under a clear duty to protect his children by providing a safe and secure home environment. Sufficient evidence was presented to show that the defendant breached that duty when he failed to supervise his children even though he was aware that the back door to his home was not secure.

We further note that "[re]cklessness involves a subjective realization of that risk and a conscious decision to ignore it. . . . It does not involve intentional conduct because one who acts recklessly does not have a

conscious objective to cause a particular result. . . . Because it is difficult to prove this through direct evidence, the state of mind amounting to recklessness may be inferred from conduct." (Internal quotation marks omitted.) *State* v. *Jones,* 289 Conn. 742, 756, 961 A.2d 322 (2008). The present case was not a situation that involved a prudent parent's momentary inattention. The defendant was not supervising the child at all, thereby permitting the child to play in a heavily trafficked street for twenty minutes. Recklessness may be inferred from the defendant's conduct because he knew that his back door was not secured, yet he failed to attend to his young child adequately despite the likelihood that the child could exit the home and injure himself.

Additionally, in *Branham,* this court determined that when children are left unattended, the trial court may infer that the children are at risk of likely injury to their health. See *State* v. *Branham,* supra, 56 Conn. App. 398. We concluded that "the jury reasonably could infer that the children, ages three and one-half, two and one, were seriously at risk of likely injury to their health or that their lives or limbs were endangered when they were left unattended in the apartment. There was sufficient evidence for the jury to conclude beyond a reasonable doubt that the physical well-being of the children was put at risk when the defendant left them in a dangerous situation, i.e., alone in the apartment, thereby exposing them to injury." Id., 398–99. Although the present case is distinguishable from *Branham* because the defendant did not leave his children home alone, the scope of § 53-21 (a) (1) foreseeably extends to a parent whose inattention is so great that his two year old child is able to leave the house unnoticed and remain outside unsupervised for twenty minutes.

The evidence was sufficient to show that the defendant's failure to supervise his children adequately, despite his knowledge that the back door of his home

was unsecured, amounted to a reckless disregard for a situation that was inimical to the physical welfare of his child. We conclude, therefore, that the court had before it sufficient evidence to support its finding, by a fair preponderance of the evidence, that the defendant committed the offense of risk of injury to a child. Accordingly, the court properly found that the defendant had violated his probation.

IV

The defendant's final claim is that the court abused its discretion by revoking his probation and committing him to the custody of the commissioner of correction for the unexecuted portion of his original one year sentence. Specifically, the defendant argues that his case was based on deficient parenting skills that he had since corrected through remedial measures; thus, he did not pose a risk to the safety of the public.

We have explained that "[a] revocation of probation hearing has two distinct components and two purposes. A factual determination by a trial court as to whether a probationer has violated a condition of probation must first be made. . . . If a violation [of probation] is found, a court must next determine whether probation should be revoked because the beneficial aspects of probation are no longer being served. . . . On the basis of its consideration of the whole record, the trial court may continue or revoke the sentence of probation . . . [and] . . . require the defendant to serve the sentence imposed or impose any lesser sentence. . . . In making this second determination, the trial court is vested with broad discretion." (Internal quotation marks omitted.) *State* v. *Bouteiller*, supra, 112 Conn. App. 53.

Therefore, we must now determine whether the court abused its discretion in revoking the defendant's original sentence. "In determining whether there has been an abuse of discretion, every reasonable presumption

should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . A defendant who seeks to reverse the exercise of judicial discretion assumes a heavy burden. . . .

"Our determination of whether the trial court abused its discretion in revoking the defendant's probation is guided by the following principles. We previously have recognized that [t]o a greater or lesser degree, it is always true of probationers . . . that they do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions. . . . These restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large. . . .

"A revocation proceeding is held to determine whether the goals of rehabilitation thought to be served by probation have faltered, requiring an end to the conditional freedom obtained by a defendant at a sentencing that allowed him or her to serve less than a full sentence. . . . [T]he ultimate question [in the probation process is] whether the probationer is still a good risk . . . . This determination involves the consideration of the goals of probation, including whether the probationer's behavior is inimical to his own rehabilitation, as well as to the safety of the public." (Citation omitted; internal quotation marks omitted.) Id., 54–55.

At the dispositional phase of the defendant's revocation of probation proceeding, the state offered evidence that the defendant previously had violated his probation in February, 2005, following an arrest on a charge of breach of the peace in the second degree; however,

the probation was continued. During the defendant's probation, he also was arrested on May 1 and September 2, 2007, on charges of sale of narcotics, assault in the third degree as an accessory and risk of injury to a child as an accessory. Those charges are still pending. The defendant's probation officer testified that the beneficial purposes of the defendant's probation had not been served because he continued to be arrested while on probation.

The defendant argued that the present violation was based on a challenge to his parenting skills, an offense that stood in stark contrast to his criminal history, which involved breach of the peace, assault and sale of narcotics. The defendant noted that the department of children and families (department) permitted him to remain in the house with his children while there was a neglect petition pending that was pretried before the trial court, *Teller, J.* The department, however, had not accepted Judge Teller's recommendation that the neglect petition be withdrawn. The defendant also noted that he completed a parenting education class, obtained child safety devices for the back door of his home and raised a fence in the backyard in an effort to provide a safer home environment for his children.

At the conclusion of the proceeding, the court considered the defendant's lengthy criminal history, noting that the defendant previously had violated probation in 1995, served a two year sentence for robbery and assault in 1997 and serve a one year sentence for assault in 1999. The court considered the remedial measures that the defendant took to make his home safer, noting that a young child could easily get through the fence that the defendant had erected. The court also considered the defendant's present probation violation, noting that "[the defendant] knew that there was no lock on the door. He knew that there was no fence around it, as evidenced by the fact that there is now a fence around

the back door. And he knew or should have known that a child could easily get out under those circumstances. It wasn't simply that the child left the premises. He left the premises and nobody knew about it. [The defendant] didn't know about it because he wasn't supervising him. He left him in the care or supervision of another child. And that created a risk of injury to this child— a risk of severe injury." The court concluded that "[the defendant] has a terrible criminal history. Apparently, he's got more problems with the law in addition to the one that we're dealing with here today. Based upon the entire record, I can't find any reason to keep him on probation. I don't think that the beneficial aspects of probation are being served in his case. This is the second violation of probation in this particular underlying sentence, and I see no reason or no purpose in keeping him on probation."

The defendant contends that the remedial measures that he took, including his parenting skills class and installation of child safety devices and a fence at his home, demonstrated his rehabilitation as a parent. He suggests that the court should have inferred from the department's decision to permit him to remain in his home with his children that the conditions of the home did not pose an immediate threat to his children. He also claims that because his pending cases were arrests as opposed to convictions, they should not have been considered at the proceeding.

Our review of the record reveals that the court did not abuse its discretion in revoking the defendant's probation. In concluding that the beneficial effects of probation were no longer being served and that the defendant's probation should be revoked, the court properly considered evidence of the defendant's long criminal history, which included a violation of probation in 1995, convictions of robbery and assault, and pending charges of sale of narcotics, robbery, assault

and breach of the peace. See *State* v. *Young*, 63 Conn. App. 794, 809–10, 778 A.2d 1015 (probation revoked where defendant had criminal history exceeding ten years), cert. denied, 258 Conn. 903, 782 A.2d 140 (2001); *State* v. *Russell*, 58 Conn. App. 275, 281, 752 A.2d 59 (2000) (court may consider defendant's entire criminal history in determining whether probation should be revoked). The court also properly considered the defendant's violation of § 53-21 (a) (1) for permitting a situation that posed a risk of injury to a child. Although the court had before it evidence of the defendant's remedial measures, the court was free to balance those considerations against the weight of the entire record. Moreover, the court was entrusted with the decision as to whether the defendant was meeting the goals of his probation, and we "must afford every reasonable presumption in favor of the correctness of that decision." *State* v. *Bouteiller*, supra, 112 Conn. App. 56. We conclude, therefore, that the court's decision to revoke the defendant's probation and to reinstate the original one year prison sentence on the basis of the defendant's criminal history and a consideration of the whole record was an appropriate exercise of judicial discretion. See *State* v. *McElveen*, 69 Conn. App. 202, 208, 797 A.2d 534 (2002).

The judgment is affirmed.

In this opinion ROBINSON, J., concurred.

WEST, J., dissenting. I respectfully disagree with the majority's determination that "the [trial] court had before it sufficient evidence to support its finding, by a fair preponderance of the evidence, that the defendant [Maurice M.] committed the offense of risk of injury to a child" and, therefore, properly found that he had violated his probation.[1] Accordingly, I dissent. I would reverse the judgment of the trial court.

---

[1] Preliminarily, because "[t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case"; (internal quotation marks omitted) *State* v. *Washington*,

I agree with the majority's statement of the applicable law and the appropriate standard of review for this issue. I do, however, underscore that in a probation revocation proceeding, "[a] challenge to the sufficiency of the evidence is based on the court's factual findings. The proper standard of review is whether the court's findings were clearly erroneous based on the evidence. . . . A court's finding of fact is clearly erroneous and its conclusions drawn from that finding lack sufficient evidence when there is no evidence in the record to support [the court's finding of fact] . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *State* v. *Hooks*, 80 Conn. App. 75, 80–81, 832 A.2d 690, cert. denied, 267 Conn. 908, 840 A.2d 1171 (2003).

The following is an excerpt of the court's findings made during the adjudicatory portion of the violation of probation hearing that is relevant to the defendant's claim.

"There are dangers in the house. And you are required under the law, if you're going to take care of the child, to make sure that those dangers are minimized.

"There are risks in the house. And that's why they have things called babyproofing houses. In this case, the child didn't fall out the second story window, but

39 Conn. App. 175, 176–77 n.3, 664 A.2d 1153 (1995); I will not address the defendant's claim that General Statutes § 53-21 is unconstitutionally vague as applied to his conduct. See *State* v. *Robert H.*, 71 Conn. App. 289, 293 n.5, 802 A.2d 152 (2002), aff'd, 273 Conn. 56, 866 A.2d 1255 (2005). As a result, I take no position on part I of the majority opinion. Cf. *State* v. *Smith*, 222 Conn. 1, 31, 608 A.2d 63 (*Berdon, J.*, dissenting), cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). Moreover, because the insufficiency of evidence claim I address would be dispositive and would result in a reversal of the judgment of the trial court, I do not address the remaining claims and express no view on the majority opinion regarding those claims.

he also didn't stay in the house. And there was no—according to [Sergeant Michael Hannaford of the East Windsor police department], there was no lock on that back door or screen. There was no lock. There was nothing to prevent him from going out. [The defendant] lives in that house. It's his responsibility, and he was the caregiver at that time. It's his responsibility to make sure that those types of situations don't exist because they are risks. . . .

"The adult had no idea where [the child] was in the house, even though he was in the house for a period of time. Had no idea that [the child] had left the house. He left the house because he was able to do so. There was no lock on the door. And he managed to get himself into the middle of a highway as the result of that. That creates a risk of serious physical harm or injury to a child. And it's not the child's fault. And it's not the . . . fault [of the child's eight year old brother]. It's [the defendant's] fault. It's his responsibility as a father and as a caregiver to make sure that that child is protected, [to] make sure that the child does not leave the house and go wandering around down the street where he didn't know where he was."

Later, during the second phase of the hearing, the court further stated: "The situation regarding [the defendant's] parenting skills is unfortunate. But this is not a parenting skill problem. This was a problem that he knew or should have known existed. It was his house. He lived in the house. He knew that there was no lock on the door. He knew that there was no fence around it, as evidenced by the fact that there is now a fence around the back door. And he knew or should have known that a child could easily get out under those circumstances. It wasn't simply that the child left the premises. He left the premises and nobody knew about it. [The defendant] didn't know about it because he

wasn't supervising him. He left him in the care or supervision of another child. And that created a risk of injury to this child—a risk of severe injury."

In light of the prevailing standard of review, I am troubled by the court's finding of fact that the defendant's back door had no lock. Nowhere is this reflected in the evidence. The court referred to the testimony of Sergeant Hannaford as stating that there was no lock. A thorough review of his testimony reveals that he never testified as such.[2] Moreover, there is no testimony from any witness stating that the door was even *unlocked.* The only testimony was that there were not any "safety devices" on the doorknobs. It is apparent that the court hinged in large part its conclusion that the defendant had committed the underlying charge of risk of injury to a child on its erroneous finding that the back door had no locks.

Essentially, there are two main factual components supporting the court's ruling: (1) the "accessibility" of the back door and (2) the lack of supervision of the child. The accessibility of the door, in turn, is largely, if not wholly, based on the erroneous finding that the door had no lock. Moreover, it is clear that the court based its finding that General Statutes § 53-21 (a) (1) had been violated on the finding that there was no lock on the back door or the screen door.[3] The court

[2] Hannaford's complete testimony on the condition of the back door was: "I noticed that there was no safety devices on the doorknobs or such that, you know, one would normally do with young children to prevent them from opening the doors, et cetera."

[3] The court filed an articulation in response to a motion filed by the defendant. In it, the court stated: "[The defendant] knew or should have known that neither the back door nor the back screen door of his house had a lock or *child safety device,* thus permitting the child to be able to exit the house." (Emphasis added.) It is obvious that the court perceived a distinction between locks and child safety devices. Nowhere, however, in its oral decision did the court make a finding that the door had no safety devices.

"The purpose of an articulation is to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal. . . . An articulation is

concluded that the fact that there was no lock on the back door—a fact that the defendant knew or should have known—directly led to the situation that the child was placed in by the defendant. The court concluded that because the defendant knew or should have known that there was no lock on either door, his placing the two year old under the supervision of the eight year old violated the statute.

To prove a violation of probation on the basis of violation of § 53-21 (a) (1), the state had to establish, by a preponderance of the evidence, that the defendant wilfully or unlawfully caused or permitted a child under the age of sixteen years to be placed in such a situation that the life or limb of the child was endangered, the health of the child was likely to be injured or the morals of the child were likely to be impaired. The court expressly found by a preponderance of the evidence that the defendant, by engaging in the conduct it found he had engaged in, unlawfully placed the child in such a situation. It is clear that the court determined that the conduct that the defendant engaged in that established by a preponderance of the evidence that he violated § 53-21 (a) (1) was leaving the child unsupervised to play with another child under the circumstances that permitted the child to exit the home. Moreover, those circumstances that indicated a violation of the statute, according to the court, consisted *exclusively* of the determination that the back doors had no locks and that "[t]his was a problem that [the defendant] knew or should have known existed."

Although I conclude that this determination was clearly erroneous, the question remains whether there

not an opportunity for a trial court to substitute a new decision nor to change the reasoning or basis of a prior decision." (Citation omitted; internal quotation marks omitted.) *Lusa* v. *Grunberg*, 101 Conn. App. 739, 743, 923 A.2d 795 (2007). Therefore, the court's articulation does not persuade me that its finding of fact concerning the condition of the back door at the time of the incident was not clearly erroneous.

is sufficient evidence on the record to support the court's finding that the defendant violated § 53-21 (a) (1). After a thorough review of the record, in my opinion there was not. The court found that the conduct that was violative of § 53-21 (a) (1) was the defendant's having left the child in the care and supervision of his sibling while there were no locks on the back door. This express finding cannot be squared with the evidence. I am very troubled by the court's repeated assertion not only that there were no locks on the back door and that the defendant knew or should have known that there were none but, more to the point, that this specific circumstance was the situation created unlawfully by the defendant that directly led to the child's being placed in harm's way. Furthermore, because the record does not contain any evidence that supports this finding, I conclude that there was insufficient evidence for the court to find, by a preponderance of the evidence, that the defendant violated § 53-21 (a) (1), and, therefore, the court's finding that the defendant violated his probation was clearly erroneous.

Accordingly, respectful of the majority, I dissent. I would reverse the judgment of the trial court.

