STATE OF CONNECTICUT *v.* CARLOS A. GUZMAN
(AC 27609)

DiPentima, Harper and West, Js.

Argued May 21—officially released September 16, 2008

*Thomas Plotkin*, certified legal intern, with whom were *Timothy H. Everett*, special public defender, and, on the brief, *Andrew Phillips*, *Kelly Glasheen*, *David Curtin*, *Michael Falcone* and *Charleen E. Merced Agosto*, certified legal interns, for the appellant (defendant).

*Robin S. Schwartz*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Patrick J. Griffin*, senior assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Carlos A. Guzman, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2). On appeal, the defendant claims that the court improperly (1) submitted the BB guns at issue to the jury with suppression hearing evidence tags on them, (2) limited the scope of his closing argument by precluding him from arguing whether a BB gun was a weapon or a deadly weapon under General Statutes § 53a-3 (6), and (3) reconstituted the jury by (a) dismissing juror K and (b) failing to remove juror M.[1] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 30, 2004, between 2 and 2:30 a.m., Joseph Vega was wandering around Cherry Street in Waterbury, at which time Pablo Texidor, an acquaintance of Vega's, drove up in his light blue-gray Nissan. While Vega was telling Texidor that he was attempting to find some drugs, the defendant walked out of the building where he lived on Cherry Street. The defendant was Vega's former neighbor and friend, and he was also acquainted with Texidor. At this point, the three men

---

[1] To protect the privacy of the jurors, we refer to them by initial. See *State* v. *Newsome*, 238 Conn. 588, 624 n.12, 682 A.2d 972 (1996).

decided that, because none of them had money and all of them wanted drugs, they would rob a drug dealer. Texidor agreed to drive the men in his car, and the defendant agreed to use his BB gun, which he retrieved from his apartment after the men had formulated a plan, to intimidate the victims and to prevent a struggle.

The three men then got into the car and headed out to accomplish their plan. First, they stopped at the home of the defendant's cousin so the defendant could retrieve a second BB gun. After retrieving the second BB gun, the three men headed to the "drug spot" on Glenridge Street in Waterbury. When they arrived at Glenridge Street, Texidor remained with the parked car while the defendant and Vega walked to the "drug spot." The defendant and Vega approached a group of people who directed them to a man standing nearby, whom they referred to as "New York," who later was identified as Jesse Brown. Brown told the defendant and Vega that he had no drugs and that they should return in five or ten minutes. After walking back to the car and reporting what had happened, Texidor suggested that they rob Brown of his money and not wait for more drugs to arrive. As a result, the three men returned to the "drug spot" to implement the new plan. This time, all three men got out of the car, but only the defendant and Vega were brandishing guns. They approached a group of people, which included Brown and the other people they had approached initially. Both the defendant and Vega, armed with their BB guns, demanded that the individuals give them their money. Vega decided to rip the gold chains from the neck of a female in the group. The robbery was accomplished quickly, and then the three men got back into Texidor's car and drove to Cherry Street, where they dropped off the defendant. Texidor and Vega continued to drive around.

Subsequently, two Waterbury police officers on patrol saw Texidor's vehicle traveling at a high rate

of speed and stopped it. Both Vega and Texidor were arrested on charges of possession of drugs and drug paraphernalia. Meanwhile, Kimberly Larson, the woman whose gold chains were stolen by Vega, had called the police to report the robbery and had provided the police officers with a description of the vehicle used in the robbery. Subsequently, Larson was taken to the place where the officers were holding Texidor and Vega. She identified them as participants in the robbery. Vega subsequently cooperated with the police investigation and confessed to having planned and carried out the robbery with Texidor and the defendant. As a result, the defendant was arrested.

The defendant was charged with two counts of robbery in the first degree in violation of § 53a-134 (a) (2).[2] After a jury trial, the defendant was convicted of count one but found not guilty on count two. On March 22, 2006, the court imposed a total effective sentence of thirteen years incarceration, with a mandatory minimum of five years, followed by four years of special parole. This appeal followed. Additional facts will be set forth as necessary.

I

First, the defendant claims that the court improperly submitted the BB guns to the jury with suppression hearing tags on them. We do not agree.

The following additional procedural and factual history is necessary for our review of the defendant's claim. On December 16, 2005, the defendant filed a

---

[2] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ." Count one pertained to the robbery of Larson, and count two pertained to the robbery of Brown.

motion to suppress the BB guns, which the court denied on January 5, 2006, after a hearing. At the hearing, the BB guns, along with several photographs taken of them, were introduced as full exhibits. As a result, each gun was marked with an exhibit sticker, which was placed on the evidence bag containing each gun. Subsequently, the BB guns were introduced as full exhibits at the defendant's trial. Again, each gun was marked with an exhibit sticker. Because the motion to suppress stickers had not been removed from the bags containing the guns, there were two stickers on the bags after the BB guns were introduced at trial.

Prior to jury deliberations, the court gave counsel the opportunity to review the exhibits that were going to be submitted to the jury in the deliberation room. At that point, the defendant objected to the jury's being able to view the BB guns with the motion to suppress stickers still attached to the evidence bags. The defendant asked if the court could "obscure the sticker that says suppression . . . ." In support of his objection, the defendant stated that the jury would receive "evidence that indicates that . . . there was a motion to suppress [the BB guns] and that the court obviously denied that motion and allowed it into evidence, which . . . suggests that the court in some way is . . . sanctioning the validity of the evidence . . . . Remember, we have two different versions; they might try to figure that out." In response, the court denied the request, stating that "to the extent that there are appellate issues raised with respect to the suppression hearing and suppression motion, those exhibits need to be identified as they were at the suppression hearing. So, we certainly can't permanently obscure them." Furthermore, the court stated that "[c]ertainly, the jury is aware that there were prior days of testimony that they were not privy to. I've given them plenty of instructions that they are to admit only evidence properly admitted in the

case. I have expressed my opinion to them that I have no opinion as to the outcome of the case. So, I think they need to stay as they've been marked."

On appeal, the defendant argues that his right to a fair trial by an impartial jury was violated when the court improperly submitted the BB guns to the jury with motion to suppress stickers affixed to the evidence bags containing the guns. He claims that the jury was free to consider the suppression hearing stickers, which signified that the defendant had attempted to exclude the BB guns from evidence. Therefore, he argues, "the jury was free to infer consciousness of guilt based on the defense efforts to suppress the weapons." The defendant asserts that "[t]he issue is whether the jury received and relied upon the improper signals that the evidence stickers and the court's instruction on consciousness of guilt conveyed: that the defendant evinced a consciousness of guilt when he moved to suppress the BB guns, that the trial court did not agree with the defendant's motion to suppress and that the jury could consider the court's denial of the defendant's motion to suppress as evidence."

The defendant did not preserve the consciousness of guilt claim at trial. His objection included only the argument that admitting the BB guns with the motion to suppress stickers affixed to them would suggest that the court was sanctioning the validity of the evidence. Our Supreme Court has stated: "The standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . .

Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 645, 945 A.2d 449 (2008).

Because the defendant did not preserve this issue at trial, he requests review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id., 239–40.

The state contends that the defendant's claim is evidentiary rather than constitutional in nature. We agree. In essence, the defendant is arguing that the jury was permitted improperly to consider certain evidence during its deliberations as evidence of his consciousness of guilt. "It has . . . been stated numerous times that consciousness of guilt issues are not constitutional and, therefore, are not subject to review under [*Golding*]." (Internal quotation marks omitted.) *State* v. *Camera*, 81 Conn. App. 175, 188, 839 A.2d 613, cert. denied, 268

Conn. 910, 845 A.2d 412 (2004). The defendant's claim regarding the court's admission of the BB guns with the motion to suppress stickers affixed to them pertained to consciousness of guilt. Accordingly, the defendant's claim, here, is premised on the improper inferences the jury may have made regarding the defendant's potential consciousness of guilt due to the presence of the evidence stickers, not on the partiality of the jury.

Because the defendant's claim is evidentiary in nature, we decline to afford it review. "Evidentiary claims do not merit review pursuant to *State* v. *Golding*, [supra, 213 Conn. 239–40], because they are not of constitutional magnitude. [R]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature. . . . Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." (Internal quotation marks omitted.) *State* v. *Cromety*, 102 Conn. App. 425, 431, 925 A.2d 1133, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007).

## II

Next, the defendant claims that the court improperly limited the scope of his closing argument by precluding him from arguing whether a BB gun was a weapon and thereby establishing that it was not a deadly weapon under § 53a-3 (6). We disagree.

The following additional facts and procedural history are necessary for our discussion of the defendant's claim. The defendant was convicted of violating § 53a-134 (a) (2), which requires that he be armed with a "deadly weapon" while committing the robbery or in the immediate flight therefrom. See footnote 2. A "deadly

weapon" is defined by statute as "any weapon, whether loaded or unloaded, from which a shot may be discharged, or a switchblade knife, gravity knife, billy, blackjack, bludgeon, or metal knuckles. . . ." General Statutes § 53a-3 (6).

After the state presented its case, the defendant made a motion for a judgment of acquittal. One of the grounds for his motion was that the BB guns are not "deadly weapons" under § 53a-134 (a) (2) because they are not "weapons" in that a BB gun is "not an instrument of offensive or defensive combat, something to fight with." In denying the defendant's motion, the court held: "State's exhibit number ten is an operable weapon in that when you insert it—a [carbon dioxide] cartridge and a BB—it is capable of being fired, and that is the key language under the statute in accordance with *State* v. *Hardy*, 278 Conn. 113, 896 A.2d 755 (2006). As to [defense counsel's] argument that it is not a weapon at all, although that argument was not explicitly addressed by *Hardy*, the court finds that it meets the definition of a weapon under the statutes . . . . As a matter of plain meaning and common sense, I think that this is an item which . . . meets the ordinary definition of a weapon."

Prior to closing arguments, the defendant discussed with the court what, exactly, he would be able to argue with respect to the BB guns. The following colloquy occurred:

"[Defense Counsel]: Well, just to clarify. May I argue whether it is a weapon or not?

"The Court: No. Again, my ruling was that it qualified as a weapon as a matter of law, and that is—that's my ruling. So, as a factual matter, you cannot argue that it's not a weapon.

"[Defense Counsel]: I cannot argue that the BB gun is not a weapon, and I cannot argue that it was incapable of firing a shot because it had no [carbon dioxide] cartridge or BBs?

"The Court: I'm not saying you can't argue that it was inoperable.

"[Defense Counsel]: I know.

"The Court: You can . . . argue that they should disregard Officer [Joseph] Rainone's testimony.[3] What you can't argue is that any inoperability that did exist, if it did exist, was by virtue of the fact of a lack of a [carbon dioxide] cartridge.

"[Defense Counsel]: And, just to clarify, a BB gun automatically is a weapon?

"The Court: A BB gun as a matter of law is a weapon."

Prior to examining the defendant's claim, we set forth the applicable standard of review. "[T]he scope of final argument lies within the sound discretion of the court . . . subject to appropriate constitutional limitations. . . . It is within the discretion of the trial court to limit the scope of final argument to prevent comment on facts that are not properly in evidence, to prevent the jury from considering matters in the realm of speculation and to prevent the jury from being influenced by

---

[3] At trial, Rainone, a Waterbury police officer and supervisor of the Waterbury crime laboratory, testified that he had test fired state's exhibit ten, which was one of the BB guns, into a metal garbage can. After he inserted a [carbon dioxide] cartridge and BBs into the gun, it successfully fired. Both the prosecutor and the defense attorney were present for the test firing of the BB gun. Rainone testified that this BB gun was operable. Rainone also testified that state's exhibit nine, which was the other BB gun, was inoperable because it was missing several parts.

improper matter that might prejudice its deliberations." (Internal quotation marks omitted.) *State* v. *Mungroo*, 104 Conn. App. 668, 676–77, 935 A.2d 229 (2007), cert. denied, 285 Conn. 908, 942 A.2d 415 (2008).

The defendant argues that when the court held that the BB gun in evidence was a weapon as a matter of law, "the court invaded the fact-finding province of the jury, effectively relieving the state of its burden to prove to the jury beyond a reasonable doubt that the BB gun in evidence was itself 'designed for violence' and therefore a 'deadly weapon.' " Moreover, the defendant claims, the decisions by this court and our Supreme Court in *State* v. *Hardy*, 85 Conn. App. 708, 858 A.2d 845 (2004), aff'd, 278 Conn. 113, 896 A.2d 755 (2006), do not hold that all BB guns are, per se, weapons. The defendant claims that in barring him from arguing whether the BB gun was a weapon was effectively barring him from arguing fully that it was not a "deadly weapon" under the statute, and, therefore, the court deprived him of his right to counsel and of a determination by the jury of whether the elements of the offense had been proven beyond a reasonable doubt.

The defendant claims that the court improperly held that he was precluded from arguing in his closing argument that the BB gun at issue in the case was not a weapon and therefore not a deadly weapon, under the definition provided in § 53a-3 (6). We disagree. In *State* v. *Hardy*, supra, 278 Conn. 128, our Supreme Court concluded that "the trial court . . . reasonably could have concluded that the air pistol used by the defendant was designed for violence and was capable of causing death or serious bodily injury. Accordingly, we conclude that the air pistol was a deadly weapon." The Supreme Court concluded that the air pistol *used by*

*the defendant in that case* was a deadly weapon, but it did not conclude that *all* air pistols are deadly weapons, and, therefore, it appears that whether a given air pistol is a deadly weapon under the statute is to be decided on a case-by-case basis by applying the facts of the case to the language of the statute.

In the present case, the court concluded that the BB gun in question "is an operable weapon in that when you insert it—a [carbon dioxide] cartridge and a BB—it is capable of being fired . . . ." Therefore, the court precluded the defendant from arguing whether the BB gun at issue in the case was a "weapon" pursuant to the statute.[4] We conclude that the court properly concluded that the BB gun was a "weapon" under the statute.

In *State* v. *Hardy*, supra, 278 Conn. 113, as in the present case, the defendant was convicted of robbery in the first degree in violation of § 53a-134 (a) (2). The object, which was proven to be a "deadly weapon" by the state, in *Hardy* was an air pistol very similar to the BB gun at issue here. In *Hardy*, the air pistol used carbon dioxide as a propellant, was designed to shoot .177 caliber pellets and contained a warning label that stated, "misuse or careless use may cause serious injury or death." (Internal quotation marks omitted.) Id., 118. In the present case, evidence was presented at trial that the gun at issue was an air gun, which used a carbon dioxide cartridge as a propellant, was designed to shoot .177 caliber BBs and contained a warning label that stated, "misuse or careless use may cause serious injury

---

[4] The court specifically stated that the defendant could argue to the jury that the gun was inoperable. The state was required to prove the operability of the gun, and, therefore, the inoperability of the gun would have foreclosed the state from achieving a conviction under § 53a-134 (a) (2). See *State* v. *Osman*, 21 Conn. App. 299, 307 n.3, 573 A.2d 743 (1990), rev'd on other grounds, 218 Conn. 432, 589 A.2d 1227 (1991).

or death." The gun therefore was virtually identical to the gun in *Hardy*.[5] Therefore, the court properly concluded that the BB gun at issue was a "weapon" under the statute.[6] Furthermore, because whether the BB gun was a "weapon" under the statute is a question of law, which is not within the province of the jury, the court properly limited the scope of the defendant's closing argument by precluding him from arguing that the gun was not a weapon and, therefore, was not a deadly weapon under § 53a-3 (6).

## III

Finally, the defendant claims that the court improperly reconstituted the jury by (1) dismissing juror K and (2) failing to remove juror M. Specifically, the defendant claims that by improperly dismissing K and failing to remove M, the court violated his "constitutional right to a fair trial before a jury drawn from a fair cross section of the community . . . ." We disagree.

The following factual and procedural history is relevant to the disposition of the defendant's claim. After

---

[5] In *Hardy*, the court held that "if a weapon from which a shot may be discharged is designed for violence and is capable of inflicting death or serious bodily harm, it is a deadly weapon within the meaning of § 53a-3 (6) . . . ." *State* v. *Hardy*, supra, 278 Conn. 127–28. In the present case, as in *Hardy*, evidence was presented that the BB gun, if misused or used carelessly, could cause serious injury or death. Additionally, our Supreme Court held in *Hardy* that the air pistol was designed for violence. In the present case, the BB gun used by the defendant was virtually identical to the air pistol used by the defendant in *Hardy*. Therefore, as in *Hardy*, the court, here, properly concluded that the BB gun used by the defendant was designed for violence and was capable of causing death or serious bodily injury. See id., 121–22 n.8.

[6] In *Hardy*, the majority noted that several other jurisdictions had concluded that pellet guns were deadly weapons under their respective statutes. Two of the cases it cited included jurisdictions that had concluded that BB guns were deadly weapons under the statutes of their states. *State* v. *Hardy*, supra, 278 Conn. 122–26. Additionally, in his concurrence, Justice Borden stated, "[i]n my view a BB gun *would* be a deadly weapon." (Emphasis in original.) Id., 136 (*Borden, J.*, concurring).

several days of jury selection, a jury of six and two alternates was selected for the defendant's trial. Prior to the commencement of evidence, however, an alternate juror requested to be released from service due to a change in circumstances with respect to his employment. Neither the state nor the defendant objected to this juror's being excused for cause, and the court subsequently excused the juror for cause. The court decided not to pick another alternate,[7] and the proceedings then continued with the jury of six and only one alternate. At the close of evidence, on January 13, 2006, the case was submitted to the jury for deliberation. On that same day, two regular jurors, M and K, requested to be released from deliberations. M was the first to request to be released. The court brought M before it, and she explained that she wanted to be released because the deliberative process was being dominated by one person, she could not "get a word in edgewise" and, therefore, she no longer wanted to be a part of the process. Finally, M acknowledged that her feelings regarding her frustrations with the deliberative process were impacting her ability to be a fair and impartial juror. At this point, the court excused M from the courtroom and solicited comments from both the state and the defendant regarding the disclosures made by M. The state suggested that the court inquire further of M whether she thought she would be able to participate fully in deliberations. The defendant, on the other hand, suggested that the court speak to the jury as a whole and advise it to allow every juror to speak and to respect the opinions of others. The court then brought M back into the courtroom and asked her if she could be a fair

[7] The defendant expressed a desire to select another alternate juror because he was not comfortable with the remaining alternate juror. The court, however, did not see a need for an alternate juror, given the length of the trial and, therefore, denied the defendant's request.

and impartial juror if the dynamics of the jury changed, to which M responded, "I don't believe so."

At that point, the court asked M to return to the jury deliberation room and then took a brief recess. Upon returning from a short recess, the court relayed to counsel that it had received a note from another juror, K, requesting to speak with the court. The court brought K into court and questioned him. K reminded the court that during jury selection he had revealed that he had a nonrefundable airline ticket for January 17, 2006, to fly to a nonrefundable business conference, which included seminars regarding his profession. K stated that being prevented from taking this business trip would present a financial hardship in that he would lose the money he had paid for the airline ticket, the first night of his hotel stay, the seminars and the registration fee for the conference. K also noted that the financial losses from missing this business trip would compound the financial losses he had suffered already due to having served on the jury to that point. K stated that the time constraints and financial pressures would not affect his deliberations, but he admitted that he had told other jurors that he had an upcoming trip and had hoped to be finished in time for his trip. Nevertheless, when asked by the court how much of a hardship this situation would be for him, K answered, "[t]his would be huge. It would be very big."

The court asked K to go out to the hallway and proceeded to speak to counsel. Both the state and the defendant asked the court not to release K. The defendant noted that K did not indicate that it truly would be a financial hardship for him to miss his business trip. Additionally, both the state and the defendant agreed that K did not state that it would affect his ability to be fair and impartial if he were to remain. After a

brief recess, the court stated that it was going to release K from jury service, stating, "I am going to excuse [K] from this case. I believe that it is unfair to him under these circumstances, particularly where he apprised the court during . . . voir dire. I heard from him that it would be a hardship to him, both financially and for his business in the long term, and I think it's unfair to force him to miss this trip. The trip is too long to put off jury deliberations. He's not going to be back for over a week, so I am going to excuse him from service." K then was excused, and M was brought into the courtroom. The court informed M that it had excused K and then asked if she would be able to participate fairly and impartially in jury deliberations with the new jury, which would include the alternate, and if the court were to direct the jury to begin deliberations anew and to deliberate respectfully. M responded in the affirmative, stating, "Your Honor, to be truthful, I believe I could, okay? . . . And I understand exactly what you're saying, I understand wholeheartedly. If I come back Tuesday and, you know, you go over everything and we start fresh, okay. I don't have a problem with that." At that point, court was adjourned for the day with no further comment from the state or the defendant.

Prior to examining these claims, we set forth the applicable standard of review. "A court may excuse a regular juror if that juror, for any reason, becomes unable to perform his or her duty. General Statutes § 54-82h (c). The power to excuse a juror under this section is expressly premised on a finding of cause. . . . Whether in the circumstances just cause exists to excuse a juror is a matter within the discretion of the . . . court." (Citation omitted; internal quotation marks omitted.) *State* v. *Walton*, 41 Conn. App. 831, 840, 678 A.2d 986 (1996).

## A

The defendant claims that the court improperly dismissed K for cause. He claims that a juror must show more than a minor financial hardship to be excused from finishing jury service once a jury has commenced deliberation. The defendant cites § 54-82h (c) for the proposition that a court may excuse a deliberating juror only if he is "unable to further perform . . . ." General Statutes § 54-82h (c). He further argues that there was no evidence on the record to suggest that K's missing his business trip would have presented an unusual hardship, and, therefore, the court abused its discretion in dismissing K.

It has long been established that a court properly may excuse a juror from further service on a jury where that service would constitute "an undue financial hardship." *Thiel* v. *Southern Pacific Co.*, 328 U.S. 217, 224, 66 S. Ct. 984, 90 L. Ed. 1181 (1946). The United States Supreme Court has held that "[jury service] is a duty that cannot be shirked on a plea of inconvenience or decreased earning power. Only when the financial embarrassment is such as to impose a real burden and hardship does a valid excuse of this nature appear." Id. In the present case, the court thoroughly questioned K regarding the financial implications that missing his previously scheduled, nonrefundable business trip would have on him and his business. K stated that he would stand to lose a significant amount of money if he were not to attend his business trip in that he would lose the money he had paid for the airline ticket, the first night of his hotel stay, the conference registration fee and the seminars. Additionally, K stated that the financial loss from missing his trip would compound the financial losses he had suffered already as a result of having served on the jury. As a result, the court found that it would be a hardship to K "both financially and for his business in the long term" to have to miss his business trip. We conclude that the court did not abuse

its discretion in dismissing K, as it made a sufficient inquiry into the situation and made a decision that was based on the ample evidence that was before the court.

## B

The defendant also claims that the court improperly retained M after she had disclosed that she did not believe she could be a fair and impartial juror as a result of difficulties in participating in the deliberative process. We disagree.

The defendant failed to preserve his claim at trial and, therefore, seeks review under both *State* v. *Golding*, supra, 213 Conn. 239–40, and the plain error doctrine. See Practice Book § 60-5. The record is adequate to review the claim, and the defendant's claim is of constitutional magnitude, as it alleges the violation of the constitutional right to a trial by jury. Nevertheless, we conclude that the court did not abuse its discretion in failing to dismiss M, and, therefore, no constitutional violation existed, and the defendant was not deprived of a fair trial.

M sent a note to the court, asking to be excused from her jury service. In response, the court questioned her as to why. After explaining her reasoning, M concluded that she thought her difficulties with the deliberative process were having an impact on her ability to be a fair and impartial juror. In questioning M for the second time, the court asked M if she thought that she could be a fair and impartial juror if the dynamics of the jury were changed and she had an opportunity to be heard. In response, M answered that she did not think that she could be fair and impartial even if the dynamics were to change. The third time the court questioned M, it asked her if she thought that she could participate in deliberations fairly and impartially if the court instructed the jury that it was to begin deliberating anew with the alternate juror replacing K and that it

was to respect each others' opinions. In response, M stated that she believed that she could be fair and impartial, that she understood what the court was stating and that she did not have a problem with commencing the deliberations anew.

The defendant argues that "[i]t is improper for a judge to rehabilitate a sitting juror who has strongly indicated that she has lost her ability to fulfill her juror's oath." In support of this contention, the defendant cites *United States* v. *Thompson*, 744 F.2d 1065, 1068 (4th Cir. 1984), a decision of the United States Court of Appeals for the Fourth Circuit in which the court held that the trial court abused its discretion "in proceeding with the trial after [a juror] gave an equivocal response to repeated questions about his ability to proceed with an open mind." In *Thompson*, the court held that the trial court should have asked for an affirmative response from the juror prior to proceeding. Id. Not only is *Thompson* nonbinding authority, but it is also not helpful to the defendant. In the present case, the court *did* seek an affirmative response from M as to whether she could be fair and impartial prior to continuing the proceedings. Only after obtaining an affirmative answer from M did the court decide to retain M and to continue the proceedings. The court properly and successfully rehabilitated M, and we therefore conclude that the court did not abuse its discretion in retaining her.

The defendant also seeks review under the plain error doctrine, which has been codified in Practice Book § 60-5. Specifically, the defendant claims that the court committed plain error because the retaining of M deprived him of his sixth amendment right to a fair and impartial jury trial. We conclude that the retaining of M did not constitute plain error.

"The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so

obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *LaBrec*, 270 Conn. 548, 559, 854 A.2d 1 (2004). In the present case, we perceive no impropriety that would rise to the level of "manifest injustice." The court properly retained M after successfully rehabilitating her. This action by the court did not create an "extraordinary [situation] . . . that . . . affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) Id., 560.

The judgment is affirmed.

In this opinion the other judges concurred.