STATE OF CONNECTICUT *v.* COREY J. HART
(AC 29767)

Harper, Alvord and Foti, Js.

Argued October 15, 2009—officially released January 12, 2010

*Raymond L. Durelli*, special public defender, for the appellant (defendant).

*Adam E. Mattei*, special deputy assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, *Jonathan C. Benedict*, former state's attorney, and *Margaret E. Kelley*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Corey J. Hart, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3), assault in the second degree in violation of General Statutes § 53a-60 (a) (2) and reckless endangerment in the first degree in violation of General Statutes § 53a-63 (a). On appeal, the defendant claims that (1) the trial court failed to instruct the jury on an essential element of the crime of assault in the second degree, (2) the evidence was insufficient to convict him of the crimes of assault in the second degree and reckless endangerment in the first degree, (3) the court abused its discretion in admitting the written statement of a witness as substantive evidence under the rule of *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and (4) the court improperly limited the questioning of a defense witness. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The evening of April 2, 2007, the defendant and

five other males were driving around Bridgeport in his mother's gray Jeep Cherokee. At that time, the defendant was a senior in high school, it was a school night and his mother was out of town. The defendant was wearing a distinctive light blue-gray jacket with geometrical designs.

At some point, a plan was made to rob a randomly selected person, and they began to look for a victim. Sometime around 11 p.m., as they were driving in a residential area near Briarwood Avenue and Renwick Drive, they drove past Thomas Fogarty as he walked home from his job at a Stop & Shop supermarket. Someone in the Jeep said to pull over. The driver turned left onto Renwick Drive and parked a short distance from where Fogarty was walking. The defendant and three other passengers in the Jeep exited the vehicle, pulled masks over their faces and walked on the right side of the street. Fogarty was walking on the left side of the street. The four masked individuals passed Fogarty, then reversed direction and walked up behind him. One of the four males put a gun to the back of Fogarty's head, and two or three of them pushed him to the ground. Fogarty was lying on his back when the assailant with the gun shot him in the shoulder and then kicked him in the neck. When the discharged shot only stung his shoulder, Fogarty realized that the weapon, which he described as a "big black gun," was a pellet gun. The other three assailants went through his pockets and took his wallet, which contained five $20 bills, a state identification card, his birth certificate, his social security card and his Stop & Shop employee card. They also took his cellular telephone. The property taken from Fogarty was divided among the occupants of the vehicle.

During the course of the robbery, Fogarty had been lying on his back for approximately one minute, and the lighting had been sufficient for him to observe his

four assailants. The man with the gun was a little to the left of him, and the other three men were directly in front of him. Although he could not see their faces because of the masks, the holes around the eyes were sufficiently large for him to determine that all four were black males. He also noticed their heights, weights and the type of clothing that they were wearing. After the assailants got back in the vehicle, Fogarty saw them speed away from the area, and he was able to see the vehicle's license plate number. He then walked the rest of the way home and telephoned the police department from his landlord's cellular telephone.

A police officer arrived shortly after the call, and Fogarty described his assailants and provided the license plate number of the Jeep. In the meantime, the defendant drove three of his passengers home and was proceeding down Main Street when he noticed a marked police cruiser traveling behind him. When the defendant was certain that he was being followed, he pulled over and he and his remaining two passengers were taken into custody. Two police officers then transported Fogarty to the location where the three suspects were being detained to see if he could identify the occupants of the Jeep. Fogarty immediately confirmed that all three males had participated in the robbery. He made his identification on the basis of their stature, weight and clothing. The identifications were made within one hour of the robbery. When the defendant was taken into custody, the police also discovered that his wallet contained several items that belonged to Fogarty.

The defendant was arrested and, by amended information, charged with robbery in the first degree, conspiracy to commit robbery in the first degree, assault in the second degree and reckless endangerment in the first degree. The defendant testified at trial. He indicated that he had been unaware that a robbery was being planned and that he simply pulled over to the

side of the road when one of his passengers asked him to do so. He further testified that he first learned of the robbery when the four males reentered the vehicle and were acting "jittery." At that point, he decided to take everyone home and was in the process of doing so when the police cruiser started following him. With respect to the evidence that Fogarty's property was found in the defendant's wallet, the defendant testified that he saw his wallet earlier in the day but did not believe that he had it with him that evening.[1]

At the conclusion of a four day trial, the jury returned a verdict finding the defendant guilty of all of the crimes charged except conspiracy to commit robbery in the first degree. As to that charge, the jury found the defendant not guilty. The court accepted the verdict and sentenced the defendant to a total effective term of eight years incarceration, suspended after four years, with five years probation. This appeal followed.

I

The defendant first claims that the court improperly instructed the jury with respect to the charge of assault in the second degree in violation of § 53a-60 (a) (2).[2] Specifically, he argues that the court failed to instruct the jury that it could find him guilty of that charge only if the state proved beyond a reasonable doubt that he caused physical injury to Fogarty by means of a dangerous instrument *other than by means of the discharge of a firearm.* The court omitted the phrase "other than by means of the discharge of a firearm" in its charge, and

---

[1] During closing arguments, defense counsel argued that Fogarty's property could have been planted in the defendant's wallet.

[2] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm . . . ."

the defendant claims that that is an essential element of the crime of assault in the second degree.

The defendant acknowledges that he did not make a proper request to charge, nor did he object to the court's instruction on assault in the second degree at trial. He maintains that his claim is reviewable under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id., 239–40.

The defendant has satisfied the first two prongs of *Golding*, as the record is adequate for review and the alleged violation is of constitutional magnitude. In *State* v. *Hinton*, 227 Conn. 301, 308, 630 A.2d 593 (1993), our Supreme Court afforded *Golding* review to the defendant's claim that the trial court improperly instructed the jury concerning the doctrine of transferred intent in connection with three murder counts. After noting that intent is an essential element of murder, the Supreme Court stated that "[a]n accused has a fundamental right, protected by the due process clauses of the federal and Connecticut constitutions, to be acquitted unless proven guilty of each element of the charged offense beyond a reasonable doubt" and that, accordingly, "a claim that the judge improperly instructed the jury on an element of an offense is appealable even if not raised at trial." (Internal quotation marks omitted.) Id.

In the present case, the state argues that the defendant's claim is not reviewable under *Golding* because it was waived at trial. In support of that argument, the state points out that the amended information specifically charged the defendant with violating § 53a-60 (a) (2) by causing injury to the victim by means of a dangerous instrument, to wit, a pellet gun. Further, the state filed a request to charge that excluded the phrase pertaining to firearms.[3] The defendant, however, never filed a request to charge with respect to the assault count, and he never claimed that he could not be convicted of assault in the second degree because the pellet gun was a firearm and not a dangerous instrument. The state also claims that the defendant acquiesced to the content of the challenged charge because he had received a copy of the proposed instructions from the judge several days before the charge was given to the jury. Not only did defense counsel not object to the proposed instructions, but he also indicated that he was satisfied with the charge conference that had occurred on the last day of the trial.

We are constrained by our Supreme Court's holding in *State* v. *Ebron*, 292 Conn. 656, 975 A.2d 17 (2009), to conclude that such a claim was not waived by the defendant's passive acquiescence to the charge as given. *Ebron*, in the context of claims of instructional error, narrowly defined waiver as a party's active inducement to give the specific charge challenged on appeal. Id., 680, 682. We are reluctant to reach the conclusion that there was no waiver in this case for the reasons set forth in *State* v. *Reynolds*, 118 Conn. App. 278, 306 n.7, 983 A.2d 874 (2009), in which this court

---

[3] "[I]t is improper for the trial court to read an entire statute to a jury when the pleadings or the evidence support a violation of only a portion of the statute . . . ." (Internal quotation marks omitted.) *State* v. *White*, 97 Conn. App. 763, 774, 906 A.2d 728, cert. denied, 280 Conn. 939, 912 A.2d 476 (2006).

noted: "At times relevant, the court inquired of counsel whether any additional issues related to its charge existed, and the court reasonably relied on the affirmative representations of defense counsel that no such issues existed. Mindful of the purpose of a charge conference, we are concerned that *Ebron* could have the effect of rendering the charge conference an inconclusive and less meaningful exercise during which there may be a decreased incentive for counsel to clearly articulate a proposed charge in a difficult area when counsel may determine it is more advantageous to leave the door ajar for another day. Such a tactic could place an arduous, unnecessary burden on the trial court in its effort to compose a fair, accurate and legally appropriate jury charge and could result in unnecessary relitigation of criminal matters." Id.

The state suggests that defense counsel's failure to raise the jury instruction issue before the trial court may have been a tactical decision. The entire case was premised on the claim that the pellet gun used to shoot and to injure Fogarty was a dangerous instrument. The issue of whether a pellet gun could be considered a firearm had not yet been resolved by an appellate court of this state. Although the original information charged the defendant with assault in the first degree, the prosecutor subsequently amended the information to charge the defendant with assault in the second degree and specifically referred to the pellet gun as a dangerous instrument in that charge.[4] The case was tried on that theory.

A dangerous instrument is defined in General Statutes § 53a-3 (7) as "any instrument . . . which, under the

---

[4] "Prosecutors . . . have a wide latitude and broad discretion in determining when, who, why and whether to prosecute for violations of the criminal law. . . . This broad discretion . . . necessarily includes deciding which citizens should be prosecuted and for what charges they are to be held accountable . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Kinchen*, 243 Conn. 690, 699, 707 A.2d 1255 (1998).

circumstances in which it is used . . . is capable of causing death or serious physical injury . . . ." At trial, Marshall Robinson, the state's expert on weapons, testified that the pellet gun at issue was capable of causing serious physical injury. The state never elicited an opinion from Robinson that the pellet gun was a firearm. .On cross-examination by defense counsel, however, Robinson was asked whether the pellet gun was a firearm, and Robinson responded that in his opinion, it was a firearm. Defense counsel immediately moved on to other areas of inquiry. This was the only point during the trial when the issue of a pellet gun being a firearm was raised, and it was raised by defense counsel. As acknowledged by the defendant during oral argument before this court, defense counsel had never used the term firearm prior to that point and never used that term again during the trial, closing arguments or posttrial proceedings.[5] Now, on appeal, the defendant raises for the first time the issue of whether a pellet gun is a firearm rather than a dangerous instrument for purposes of § 53a-60 (a) (2) and whether the court's failure to include the firearm language in its jury instruction constituted a failure to instruct on an essential element of the crime.

Although, for the reasons stated previously, the defendant's passive acquiescence to the challenged charge does not constitute waiver, we do question whether, under the circumstances as reflected in the record, the defendant waived his right to require the state to prove that particular element of the crime. "While our Supreme Court has acknowledged that the state usually must prove all undisputed elements of a crime beyond a reasonable doubt, an element may be conceded by the defendant . . . and we have not

---

[5] Appellate counsel for the defendant further noted that the failure to focus on the term "firearm" may have been ineffective assistance of counsel or may have been a tactical decision.

required an express waiver of the right to require the state to prove each element of a crime. . . . Due process of law requires that the proceedings shall be fair, but fairness is a relative, not an absolute concept. It is fairness with reference to particular conditions or particular results. . . . To allow [a] defendant to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state with that claim on appeal. . . . We conclude that waiver of the right to require the state to prove each element of a crime may be made by counsel and may be inferred from the absence of an objection." (Citations omitted; internal quotation marks omitted.) *State* v. *Cooper*, 38 Conn. App. 661, 669–70, 664 A.2d 773, cert. denied, 235 Conn. 908, 665 A.2d 903 (1995), cert. denied, 517 U.S. 1214, 116 S. Ct. 1837, 134 L. Ed. 2d 940 (1996).

Here, after eliciting testimony from Robinson that in his opinion the pellet gun was a firearm, the defendant immediately abandoned any further reference to firearms; he asked no follow-up questions and made no arguments proposing that the pellet gun at issue was a firearm rather than a dangerous instrument. Because the defendant originally had been charged with assault in the first degree, which requires the use of a firearm,[6] such an argument or questions likely would have resulted in a request to amend the information to reinstate the original, more serious charge.[7] The absence

[6] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[7] The state filed its amended information prior to the commencement of trial. Leave of the court to amend an information is not required unless it is filed after the trial has commenced. See Practice Book § 36-18. A criminal trial begins with the voir dire of the prospective jurors. *State* v. *Vitale*, 76 Conn. App. 1, 15, 818 A.2d 134, cert. denied, 264 Conn. 906, 826 A.2d 178 (2003).

If the defendant had raised this issue prior to jury selection, the state could have amended the information to reinstate the more serious charge

of an objection in this situation may very well constitute a waiver because it would have been against the defendant's interest for his counsel to argue the issue he now raises on appeal.

Even if we assume that there was no waiver, the defendant's claim still fails. The pellet gun in this case was not proved to be a firearm as a matter of law. We first note that the state proved that the pellet gun was a dangerous instrument, as evidenced by the jury's verdict of guilty on the charge of assault in the second degree as set forth in the amended information. Moreover, the defendant conceded at oral argument before this court that a pellet gun could be a "deadly weapon," a "dangerous instrument" or a "firearm." See General Statutes § 53a-3 (6), (7) and (19).

Contrary to the defendant's claim, our appellate case law has not determined that *all* pellet guns are firearms as a matter of law.[8] In *State* v. *Guzman*, 110 Conn. App. 263, 955 A.2d 72 (2008), cert. denied, 290 Conn. 915, 965 A.2d 555 (2009), the defendant was convicted of having violated § 53a-134 (a) (2), which required that

without requesting permission from the court. After trial commenced, the state would have been required to request permission pursuant to Practice Book § 36-18.

[8] If a pellet gun is a firearm as a matter of law, then the state proved that the defendant committed assault in the first degree in violation of § 53a-59 (a) (5). As previously discussed, the jury found the defendant guilty with respect to the charge of assault in the second degree in violation of § 53a-60 (a) (2). Both statutory provisions require that the state prove that a physical injury occurred; assault in the first degree provides that the injury is caused by a firearm, and assault in the second degree provides that the injury is caused by a deadly weapon or dangerous instrument other than a firearm. Except for the type of weapon, the statutory language of both provisions is identical.

Assault in the second degree is a class D felony, punishable by a maximum term of imprisonment of five years. See General Statutes §§ 53a-60 (b) and 53a-35a. Assault in the first degree is a class B felony, punishable by a maximum term of imprisonment of twenty years. See General Statutes §§ 53a-59 (b) and 53a-35a.

he be armed with a "deadly weapon" while committing the crime of robbery or in the immediate flight therefrom. The defendant claimed that the weapon used, a BB gun, did not qualify as a "deadly weapon." The trial court determined that it did, and this court affirmed the judgment. We concluded that the gun *in question* was a "deadly weapon" under the statute. In reaching that conclusion, this court relied on our Supreme Court's decision in *State* v. *Hardy*, 278 Conn. 113, 896 A.2d 755 (2006). "The Supreme Court concluded that the air pistol *used by the defendant in* [*Hardy*] was a deadly weapon, but it did not conclude that *all* air pistols are deadly weapons, and, therefore, it appears that whether a given air pistol is a deadly weapon under the statute is to be decided on a case-by-case basis by applying the facts of the case to the language of the statute." (Emphasis in original.) *State* v. *Guzman*, supra, 275. This court further held that whether the BB gun was a "deadly weapon" under the statute was a question of law, which was not within the province of the jury. Id., 276.

Subsequent to the filing of appellate briefs and oral argument before this court, our Supreme Court decided *State* v. *Grant*, 294 Conn. 151, 982 A.2d 169 (2009). The issue in that case was whether the state could establish that a BB gun is a "firearm" for purposes of General Statutes § 53-202k, which provides for the imposition of a mandatory five year term of imprisonment on any person who uses or is armed with and threatens the use of a firearm in the commission of a class A, B or C felony. The court, after stating that its review was plenary because the issue was one of statutory interpretation, concluded that a BB gun does not fall outside the definitional purview of § 53a-3 (19), which defines the term firearm, merely because it operates without gunpowder. Accordingly, the court concluded that the

defendant could not prevail on his claim that the evidence adduced by the state was insufficient to establish that "the BB gun he used in connection with his attempted robbery of the victim" was a firearm for purposes of § 53a-3 (19) and that it was therefore insufficient to support his conviction under § 53-202k. Id., 161–62.

As in *Hardy*, the court in *Grant* focused on the gun used by the defendant to perpetrate the crime. It did not conclude that *all* BB guns are firearms within the meaning of § 53a-3 (19). In the present case, the court did not address the issue of whether the pellet gun used in this robbery and assault was a firearm under § 53a-3 (19). It was not requested to do so. The case was not tried on that premise, nor was the defendant charged as having committed the assault with anything other than a "dangerous instrument." Because not all pellet guns are firearms as a matter of law, the court would not have been expected to raise that issue sua sponte. Although there had been a response from Robinson from which the court may have been able to have made such a conclusion, neither the defendant nor the state requested a determination. On the basis of this record, we cannot conclude that the pellet gun in this case was a firearm.

Because we conclude that the defendant has not demonstrated that a constitutional violation clearly existed, depriving him of a fair trial, his claim must fail. See *State* v. *Golding*, supra, 213 Conn. 240.

II

The defendant next claims that there was insufficient evidence to support his conviction of the crimes of assault in the second degree in violation of § 53a-60 (a) (2) and reckless endangerment in the first degree in violation of § 53a-63 (a).

The defendant's claim as to his conviction of assault in the second degree is founded on the same premise as his challenge to the court's instruction on the elements of that crime, namely, that he could not be convicted because the state did not submit evidence to prove that the physical injury to Fogarty was caused by a dangerous instrument *other than a firearm*. That claim fails for the reasons set forth in part I of this opinion.

With respect to the defendant's conviction of reckless endangerment in the first degree,[9] he argues that the evidence presented was insufficient for that conviction because the court had instructed the jury that it could find him guilty only as a principal as to that charge. He claims that the only evidence as to his conduct that night consisted of his driving to and from the scene and searching Fogarty's pockets, and that such conduct did not constitute reckless conduct that created a substantial risk of death or serious disfigurement to another person.

We apply a two part test in reviewing sufficiency of the evidence claims. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and

---

[9] General Statutes § 53a-63 (a) provides: "A person is guilty of reckless endangerment in the first degree when, with extreme indifference to human life, he recklessly engages in conduct which creates a risk of serious physical injury to another person."

logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Rodriguez*, 93 Conn. App. 739, 748–49, 890 A.2d 591 (2006), appeal dismissed, 281 Conn. 817, 917 A.2d 959 (2007).

"[T]he probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. . . . It has been repeatedly stated that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Riser*, 70 Conn. App. 543, 552, 800 A.2d 564 (2002).

In the present case, the defendant stresses the difference between principal liability and accessorial liability with respect to this charge. He argues that because the court failed specifically to include instructions on accessorial liability with respect to the charge of reckless endangerment in the first degree, as it concededly had done with respect to the robbery and assault charges, only the defendant's individual conduct could be considered by the jury. See *State* v. *Montgomery*, 22 Conn. App. 340, 346, 578 A.2d 130, cert. denied, 216 Conn. 813, 580 A.2d 64 (1990). He claims that his conduct alone was insufficient to convict on that charge.

"[T]here is no such crime as being an accessory . . . . The accessory statute merely provides alternate

means by which a substantive crime may be committed." (Internal quotation marks omitted.) *State* v. *Harris*, 198 Conn. 158, 163, 502 A.2d 880 (1985). "This state . . . long ago adopted the rule that there is no practical significance in being labeled an 'accessory' or a 'principal' for the purpose of determining criminal responsibility." Id., 164. Nevertheless, the defendant's claim requires that we focus on whether the court failed to give an accessorial liability instruction with respect to the charge of reckless endangerment and, if so, whether the evidence with respect to his conduct was sufficient to support his conviction on that charge.

In the court's charge to the jury, it made the following general comments: "Now, subject to the instructions that I'm going to give you shortly on accessory liability, you must be satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime or you must find the defendant not guilty. If you have a reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty.

"Now, as I'll explain in a moment, a person may be guilty of a crime either as a direct participant or as an accessory. An accessory is one who, acting with the required mental state, aids in the commission of a crime. Accordingly, if you had a reasonable doubt as to the accuracy of the identification of the defendant as a direct participant, you should consider whether the state has proved beyond a reasonable doubt that he acted as an accessory." The court then described the elements of the charge of robbery in the first degree and gave a comprehensive instruction on accessorial liability.

Before proceeding to its instructions on the second offense charged in the information, the court made the following remarks. "So, let me just summarize the state's claims here on this robbery count, which sort

of are the claims throughout the whole case. Look, the state's claim is [that] the defendant, with these other people, committed a street robbery of . . . Fogarty, and the defendant either acted as one of the active participants that accosted [Fogarty] or as an accessory in the role of the getaway driver. That's the state's claim.

"The defendant, on the other hand, claims [that] he was present when this happened, but he had no knowledge that it was taking place and only learned about the crime later and did not intentionally aid in the commission of the robbery." The court subsequently gave a jury instruction on the charge of assault in the second degree and, after stating the elements of the crime, instructed that the principles of accessorial liability also applied to the assault charge. Finally, the court instructed on reckless endangerment in the first degree. It did not, however, mention accessorial liability in that instruction.

We will assume, for purposes of the defendant's claim, that the court failed to give an instruction as to accessorial liability with respect to the charge of reckless endangerment in the first degree. Considering only the defendant's conduct as to this charge, we conclude that the evidence was sufficient to support a conviction. The jury reasonably could have concluded from the evidence presented, including the inferences reasonably drawn therefrom, that the defendant's conduct was reckless and created a substantial risk of death or serious disfigurement to Fogarty.

At trial, evidence was presented that indicated the defendant was in the Jeep when the plan to rob someone was made, that he and the others drove around Bridgeport looking for a victim, that he and three others exited the Jeep after they saw Fogarty, with the intent to rob him, that a "big black gun" was prominently displayed and fired during the course of the robbery, that two or

three of the assailants pushed Fogarty to the ground, that the defendant then rummaged through Fogarty's pockets after Fogarty was shot by the pellet gun and kicked in the neck, that the Jeep sped away from the scene after Fogarty's money and other property had been taken from him, that Fogarty's property was divided among the assailants and that some of that property was located in the defendant's wallet. In other words, the evidence supported the conclusion that the defendant was an active participant in an armed robbery.

Given the testimony that the pellet gun used was capable of causing serious physical injury, the jury reasonably could have concluded that the defendant was aware that a pellet gun was being used during the robbery and that firing it at a victim could result in serious physical injury. The defendant's conduct, in which he facilitated and participated in a confrontation between a victim and four masked individuals, one armed, at 11 p.m., approaching the victim from behind on a dead-end residential street, evidenced an extreme indifference to human life. The jury had sufficient evidence to support the defendant's conviction of reckless endangerment in the first degree as a principal.

III

The defendant's next claim is that the court abused its discretion in admitting the written statement of a defense witness, Paulo L.,[10] as substantive evidence under the rule of *State* v. *Whelan*, supra, 200 Conn. 753, because that statement was not sufficiently reliable.[11] We disagree.

[10] Paulo L. was sixteen at the time of the incident. As subsequently noted in this opinion, he applied for youthful offender treatment.

[11] "The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the wide discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Camacho*, 92 Conn. App. 271, 289, 884 A.2d 1038 (2005), cert. denied, 276 Conn. 935, 891 A.2d 1 (2006).

Paulo L. was one of the three occupants of the Jeep taken into custody and identified by Fogarty as a participant in the robbery. He gave one written statement at the time of his arrest and a second written statement seven months later, on November 9, 2007. In the first statement, he denied any involvement in the robbery. In the second statement, he implicated himself and the defendant as participants. At trial, as a witness for the defense, he testified that he and the defendant were unaware that a robbery was being planned or that it had taken place until the assailants returned to the Jeep.

During cross-examination, the state offered the second written statement for substantive purposes under *State* v. *Whelan*, supra, 200 Conn. 753. The defendant objected to its admission. Outside of the presence of the jury, defense counsel argued that the statement was not reliable for the following reasons. "I propose that this statement was subject to coercion, because [Paulo L.] was in front of Judge Thim, he tried to plead guilty because he was being charged as a youthful offender, and he wasn't going to end up with a criminal record, and he didn't have enough money to pay his lawyer for a trial. He told the judge all these things, and the judge would not accept his plea because he could not find a factual basis.

"So, my argument is, he made this statement so that the judge would take his plea so that his mother doesn't have to suffer the consequences of paying $15,000 to [the attorney for Paulo L.], and so that he could get it all over with because it was a problem for him to keep coming to court and worrying about what the outcome was going to be when he knew the outcome. He knew he was going to end up with no criminal record if the judge would just take his plea."

The court overruled the defendant's objection to the admission of the statement, finding that it met all of

the *Whelan* requirements.[12] The court noted that Paulo L. had signed the statement under oath and that "that's how we determine reliability." Before the jury returned, the court further stated that it would permit "reasonable questioning" about the "extenuating circumstances" under which the statement was given.

The *Whelan* rule allows the substantive use of a prior inconsistent statement if it is signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination. *State* v. *Whelan*, supra, 200 Conn. 753. Although conceding that the statement satisfied the requirements of *Whelan*, the defendant argues that the court improperly failed to conduct a hearing; see *State* v. *Mukhtaar*, 253 Conn. 280, 750 A.2d 1059 (2000); to determine whether the statement was reliable. In *Mukhtaar*, our Supreme Court noted that "a prior inconsistent statement that fulfills the *Whelan* requirements may have been made under circumstances so unduly coercive or extreme as to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that of the witness. In such circumstances, the trial court must act as a gatekeeper to ensure that the statement does not go to the jury for substantive purposes." Id., 306.

A statement that satisfies the *Whelan* requirements is, however, presumptively admissible. Id. The *Mukhtaar* court would not exclude such a statement unless a strong showing is made as to its unreliability. "We emphasize, however, that the linchpin of admissibility is reliability: the statement may be excluded as substantive evidence only if the trial court is persuaded, in light of the circumstances under which the statement was made, that the statement is so untrustworthy that its admission into evidence would subvert the fairness of

---

[12] Defense counsel did not challenge that conclusion.

the fact-finding process. In the absence of such a showing by the party seeking to exclude a statement that meets the *Whelan* criteria, the statement is admissible as substantive evidence; like all other evidence, its credibility is grist for the cross-examination mill. *Thus, because the requirements that we established in Whelan provide a significant assurance of reliability, it will be the highly unusual case in which a statement that meets the Whelan requirements nevertheless must be kept from the jury."* (Emphasis added.) Id., 306–307.

Contrary to the defendant's claim, the court was not required to conduct a full evidentiary hearing simply because he claimed that Paulo L.'s statement was not reliable.[13] Prior to the admission of the second written statement pursuant to *Whelan*, Paulo L. already had testified that he gave that statement at the police department, under oath, and with his mother present as a witness. He also testified that he and his mother had read it over several times prior to signing it. At that point, the state moved for the statement's admission, the defendant objected, and the jury was excused.

Given these circumstances, we conclude that the court followed the procedure established in *Mukhtaar* and fulfilled its gatekeeping responsibility to ensure the reliability of Paulo L.'s statement. The court already had heard testimony as to the circumstances under which the second statement had been made, and defense counsel made his preliminary showing as to the facts that he claimed grievously undermined the

---

[13] "If a statement meets the four *Whelan* requirements, it will be deemed admissible, unless the party seeking to exclude it makes a preliminary showing of facts that, if proven true, would grievously undermine the statement's reliability. If such a showing has been made—and we leave the methods and contours of such a showing to the discretion of the trial court—the court should then hold a hearing to determine the truth of those facts and whether they do, in fact, grievously undermine the reliability of the statement." *State* v. *Mukhtaar*, supra, 253 Conn. 307 n.27.

reliability of that statement. It is true that the court relied heavily on the fact that the second statement was given under oath. The fact that a *Whelan* statement is given under oath *is* a factor, however, that *adds* to the assurance of that statement's reliability. See *State* v. *Whelan*, supra, 200 Conn. 754–55; *State* v. *Stevenson*, 53 Conn. App. 551, 560, 733 A.2d 253, cert. denied, 250 Conn. 917, 734 A.2d 990 (1999). If untrue, Paulo L. faced prosecution for giving a false sworn statement to the police. General Statutes § 53a-157b. Adding this to the other indicia of reliability testified to by Paulo L., we cannot conclude that the court abused its discretion in allowing the state to introduce the statement into evidence for substantive purposes.

## IV

The defendant's final claim is that the court improperly limited the scope and extent of his questioning of Paulo L. when defense counsel attempted to rehabilitate him after the admission of the *Whelan* statement. Specifically, the defendant argues that he was precluded from eliciting relevant evidence explaining Paulo L.'s prior inconsistent statement. The particular question asked, the objection to which was sustained by the court, was whether Paulo L. still planned on pleading guilty when he made his November 9, 2007 statement to the police.[14]

The defendant's claim fails for several reasons. Defense counsel already had been advised by the court that he could make reasonable inquiries as to Paulo L.'s motivation for providing the statement that he did on November 9, 2007. Despite that ruling, the defendant

---

[14] The following question, objection and ruling are at issue:

"[Defense Counsel]: When you made this statement to—the November 9, 2007 statement . . . were you still planning on pleading guilty?

"[The Prosecutor]: Objection, Your Honor. It's not relevant.

"The Court: It isn't. Objection is sustained.

"[Defense Counsel]: Okay. Just one moment, please? That's all; thank you."

never asked Paulo L. directly whether his second statement was made under duress in order to persuade Judge Thim to accept his guilty plea. Nevertheless, prior to the challenged ruling, the jury heard Paulo L.'s testimony that he had appeared before Judge Thim and made various untrue statements to him because he wanted Judge Thim to accept his guilty plea. He further testified, in the presence of the jury, that he did so because he and his mother did not have enough money to take the matter to trial. Even without a response to the question precluded by the court, the jury already had evidence before it from which it could evaluate the credibility of Paulo L. with respect to his testimony at the defendant's trial and the circumstances under which he had given his prior statements.

Defense counsel was precluded from asking one question only, which was asked during the redirect examination of the witness. The court had ruled that he would not be able to question Paulo L. about the procedural aspect of his plea agreement but that he could ask *why* he said what he did in his November 9, 2007 statement. Instead, defense counsel asked him whether he still planned on pleading guilty at the time he gave that statement. After the state's objection was sustained on the ground of relevance, defense counsel did not ask any further questions addressed to the truthfulness of that statement.

"[O]ur standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Internal quotation

marks omitted.) *State* v. *Young*, 63 Conn. App. 794, 798, 778 A.2d 1015, cert. denied, 258 Conn. 903, 782 A.2d 140 (2001).

On appeal, the defendant argues that the answer to the precluded question was relevant because if Paulo L. had responded affirmatively, the jurors would have been provided with a motive underlying his statement of November 9, 2007. If Paulo L. had responded in the negative, the defendant claims, the jurors then would have had conflicting evidence from which to determine his credibility. As previously stated, the jury already had testimony concerning the reasons for the statements by Paulo L. implicating him in the robbery. The answer to that question would have been cumulative. With respect to the evaluation of his credibility, the jury already had evidence of the various inconsistent statements contained in his first statement, his second statement and his testimony at trial. The defendant has failed to demonstrate that the court abused its discretion in precluding that question or how he was prejudiced by the court's ruling.

The judgment is affirmed.

In this opinion the other judges concurred.